[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Arnold,* Slip Opinion No. 2016-Ohio-1595.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1595

THE STATE OF OHIO, APPELLEE, *v.* ARNOLD, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Arnold,* Slip Opinion No. 2016-Ohio-1595.]

*Constitutional law—Fifth Amendment—Privilege against self-incrimination—Trial court's failure to inquire into basis for witness's assertion of privilege was harmless—Defendant's standing to raise claim based on court's alleged denial of witness's Fifth Amendment right—Sixth Amendment—Confrontation Clause—Admission of witness's prior statement to police when witness refused to testify regarding incident leading to defendant's arrest was not plain error.*

(No. 2014-0718—Submitted May 27, 2015—Decided April 20, 2016.)

APPEAL from the Court of Appeals for Seneca County, No. 13-13-27, 2014-Ohio-1134.

_____

**O'CONNOR, C.J.**

{¶ 1} In this appeal, we address the manner in which trial courts should analyze a witness's assertion of the constitutional right against self-incrimination. We further consider the manner in which appellate courts should evaluate a defendant's assertion, for the first time on appeal, that the trial court violated his right to confront witnesses. Because we hold that any error in the trial court's handling of the claim of privilege during the trial in this cause was harmless beyond a reasonable doubt and that there was no Confrontation Clause violation, we affirm the judgment of the court of appeals and the conviction of appellant, Jeffrey Arnold.

**RELEVANT BACKGROUND**

{¶ 2} This appeal arises from Arnold's conviction for domestic violence in violation of R.C. 2919.25(A), a misdemeanor in the first degree. R.C. 2919.25(D)(2). After a bench trial in the Fostoria Municipal Court, the trial judge found Arnold guilty of domestic violence against his father, Lester Arnold. Arnold, a 28-year-old man, lived with his parents, Connie and Lester Arnold.

{¶ 3} On the date of the incident, Connie and Lester's 11-year-old grandchild was visiting them. The family gathered in the kitchen as Connie cooked dinner. Arnold, who "wasn't especially happy" with what his mother was making, became "upset" and "threatening."

{¶ 4} The grandchild became anxious, left the kitchen, retreated to "the other end of the house," and asked to leave the Arnold home. Lester, too, left the agitated Arnold in the kitchen. In fact, Lester got up from the family table, went down the hall, and entered the computer room in an apparent attempt to deescalate the situation. But Arnold followed him into the room, where he grabbed his father by the hair, punched him in the head, and choked him. Arnold continued to yell at Lester and prevented him from leaving the room.

{¶ 5} Connie could not see the assault because the door was closed, but she heard a "[c]ommotion" and "crashing" and "struggling" sounds. Frightened, she

2

fled the house with her grandchild, despite the cold temperature and snow outdoors. Upon seeing a neighbor, Connie asked him to call the police.

{¶ 6} Upon arrival at the residence, police repeatedly attempted to communicate with Arnold. He would not speak with police and refused to let police speak with Lester. Arnold's refusal to communicate with police or to permit Lester to do so, along with the presence of firearms in the home and a history of threats involving assault weapons at the residence, alarmed police. They called for the SWAT team and began to prepare for a forced entry.

{¶ 7} After holding Lester captive for approximately 20 to 30 minutes, Arnold released him through the garage. Police found Lester "very scared," "agitated," and "very nervous" and Connie "definitely scared, very agitated, very nervous, very shaky." Lester expressed fear about what might happen in the future.

{¶ 8} Arnold, meanwhile, had fled the home.

{¶ 9} Police, concerned for Connie and Lester's safety in the home, cautioned that they spend the night elsewhere. They agreed and returned home the following day with a police escort.

*Pretrial events*

{¶ 10} On March 27, 2013, the Fostoria Police Department filed a criminal complaint in the Fostoria Municipal Court alleging that Arnold had unlawfully and knowingly caused or attempted to cause physical harm to Lester. The trial court arraigned Arnold on March 28, 2013. Arnold's bail conditions, including an order that he have no contact with Lester and Connie and pay a $40,000 appearance bond, reflect the trial court's careful consideration of the nature of the crime and its adherence to the bail statute governing domestic-violence cases. *See* R.C. 2919.251.

{¶ 11} Despite the fact that Arnold was held pending trial, Connie and Lester remained in fear of Arnold even six weeks after the assault. In a letter signed by both, they asked the trial court to modify the contact order so that they could

communicate with Arnold, but only "through writing, telephone conversations, and visiting in secure surroundings, such as at the jail." In making the request, they made it clear that they needed to communicate with Arnold over Arnold's "outstanding bills" and expressly requested that the order remain "in effect until [Arnold] has received help and can control his emotions with us."

*Trial*

{¶ 12} At trial, the state called Lester as its first witness, which, as will be explained, proved nearly futile. Rather, the state's case was entirely established through the testimony of Connie and the officers at the scene. Indeed, the trial court, in pronouncing its judgment, expressly stated that even without Lester's testimony, the state had met its burden. We summarize the most relevant portions of the evidence presented at trial.

*Lester's testimony and statement*

{¶ 13} Lester's testimony offered no incriminating evidence. After initially identifying himself at the judge's request, Lester asserted an inability to recall the precipitating events and refused repeatedly to answer the state's questions by asserting his right against self-incrimination. In fact, after providing only basic facts,[1] Lester asserted the privilege against self-incrimination at least eight times in responses to questions posed to him by the state about Arnold's assault. For all practical purposes, that assertion ended the query on that point. The trial court never ordered him to answer a question to which Lester had objected on Fifth Amendment grounds.

{¶ 14} More significantly for our purposes here, Lester never offered a single word of explanation about how his answers might incriminate him, despite repeated invocation of his right against self-incrimination. And Arnold's counsel similarly failed to do so.

---

[1] Lester gave his name and address, stated that he lived with his wife and son, and identified Arnold in the courtroom.

4

**{¶ 15}** The court's only order compelling Lester to testify related to his reading of his prior written statement to the police. After Lester refused to identify his prior statement, and without asking Lester to endorse, adopt, or accept it, the state asked Lester to read that statement. Arnold's attorney objected on the basis that Lester had "invoked his Fifth Amendment privilege." The state countered that Lester had not given a basis for invoking the right against self-incrimination, and defense counsel's only response was that Lester "would be reading a statement in which he indicated that he was, couldn't remember being—," at which point the trial judge interjected, stating, "I don't see what the harm would be in having him read the statement," and overruled defense counsel's objection. The court directed Lester to read the statement—its only order compelling testimony by Lester in the face of an asserted privilege.

**{¶ 16}** Lester read the statement and reiterated that he did not remember making it upon being released from the house.[2] He did not adopt or endorse its contents.

**{¶ 17}** Lester's direct testimony ended with his statement that all he remembered was telling a responding police officer that he did not want his son charged or arrested and that "[a]ll we needed was some space between us."

---

[2] When asked to acknowledge that he made a written statement to a police officer, Lester stated, "I don't remember. My blood sugar level was extremely high. My vision was distorted. The tinnitus in my ears were ringing so loud I couldn't hear anything, so. I—I couldn't see." Without being asked about his medical condition, he volunteered that he was "being treated for Post Traumatic Stress Disorder, chronic and severe. I've been on medication and treatment for [it], since 2005." Arnold's focus at trial on this evidence is confusing. It adds nothing probative of the issues here. If Lester was being truthful in his testimony, the symptoms he described are consistent with victims of domestic violence who have been "choked" or strangled. *See, e.g.,* Strack, McClane & Hawley, *A Review of 300 Attempted Strangulation Cases, Part I: Criminal Legal Issues*, 21 J.Emergency Med. 303, 305 (2001). Notably, despite the lethality of strangulation injuries, police officers reported no signs of visible injuries on the victim in half of the cases; in another 35 percent of the cases, the injuries are "too minor to photograph." *Id.* at 306, 308. Regardless of whether Lester's memory loss was real or feigned or whether he had visible indications on his body of the attack, there is no showing that the use of his prior statement was improper. *See, e.g.,* Evid.R. 613(B); *State v. Reed*, 155 Ohio App.3d 435, 2003-Ohio-6536, 801 N.E.2d 862, ¶ 29-30 (extrinsic impeachment may be used when a witness says that he cannot remember making a prior statement).

**{¶ 18}** On cross-examination by Arnold's attorney, Lester again reiterated that he could not remember the written statement and that he could not remember if Arnold had caused or attempted to cause him harm on March 25. He said, "I don't remember. I don't think so but I don't remember." Lester never definitively stated that his son did not cause him harm, as his position was that he did not remember. He was then excused.

*Officer Bethel's testimony*

**{¶ 19}** The state's next witness, Fostoria Police Department Officer Brett Bethel, testified on direct examination that he spoke to Lester immediately after he was released from the residence. Officer Bethel described both Connie and Lester as being scared, agitated, and nervous. He further testified that Lester stated that Arnold became "agitated" about what his mother was cooking and then "[p]unched [Lester] in the head [and] grabbed him in a chokehold." Although Officer Bethel could not recall whether he observed injuries to Lester, he did remember that Lester's hair was "disheveled." He also recalled that after Connie heard the assault, she "became scared and ran out of the house."

*Connie's testimony*

**{¶ 20}** The state called Connie as its next witness. She testified that Arnold "wasn't especially happy" with what she had made for dinner, that there was a "commotion," that her grandchild went to the other end of the house, and that she had followed to check on the child. As she returned down the hallway to the kitchen to call the child's parent, she observed her husband get up from the table and go down the hall to the computer room. Arnold followed him, and although she could not see into the computer room, she heard "a crashing sound" and "a struggling sound" in the room.

**{¶ 21}** Connie testified that at that point her "main priority was to get my grand[child] out of the house." Once outside, she asked a neighbor, "in the interest

of safety," to call the police to "check on things." When Arnold finally released Lester from the home, Connie observed that Lester looked "shook up."

{¶ 22} Significantly, on cross-examination, Arnold's counsel explored his theory that Lester was the aggressor against Arnold. Arnold's counsel elicited that Lester is a veteran of the United States Marine Corps who served his country in Vietnam and that he is treated by a psychiatrist and therapist for anger stemming from posttraumatic stress disorder. And counsel established that Lester "can have a temper" with Connie and Arnold. But Connie was unequivocal in her testimony that Lester's temper and agitation had improved over ten years of treatment, including therapy, the use of medications, and the support of other Marines with whom Lester served. Due to that treatment, Connie testified, Lester is less angry and for shorter periods of time. Most importantly for purposes here, Connie testified that on the day of the assault, after Lester and Arnold had "had words" in the kitchen, Lester went to the computer room because he "*wanted to get away*, whatever he and [Arnold] had said to each other, I took it as *he was going in the other room like to cut it off or to get away from what they were doing.*" (Emphasis added.)

{¶ 23} Connie recalled that the police were concerned for her well-being and the well-being of Lester and suggested that they not return to the home that evening. After spending the night elsewhere, Connie followed police advice to have them escort her and Lester home the next day.

*Officer Ely's testimony*

{¶ 24} The state's last witness was Officer Evan Ely. He explained that he and another officer spoke to Arnold through the front doorway, but Arnold rebuffed his initial efforts to talk and to make sure that Lester was unharmed. Arnold said that he didn't have to talk based on his perception of Supreme Court precedent and "some commercial code." The encounter ended with Arnold slamming the door in Ely's face. Ely then described the police response, including the use of a

loudspeaker to coax Arnold out and the summoning of a SWAT team, but police soon learned that Arnold had fled.

{¶ 25} Officer Ely testified that Lester completed his written statement upon being released from the house. Officer Ely noted that he asked Lester, after Lester completed the statement, whether it was true and reflected the best of his knowledge "under the penalty of law." And Lester signed the statement.

### Closing arguments and the state's theory

{¶ 26} In closing arguments, the state asserted up front that "even with the reluctance of Lester Arnold to testify here today," it had sustained its burden of proof. The state relied little on Lester's testimony. Instead, it used the written statement he had provided to police at the scene, the observations of the police officers on the scene, and Connie's testimony to establish that Arnold had been the aggressor and had attempted to cause or had caused Lester physical harm. Defense counsel noted that Lester had asserted his right against self-incrimination but still did not articulate any reason why the right had been invoked or why it should be honored in this case. And the defense argument focused largely on whether the state had proven that Arnold had harmed Lester and on suggesting that the state had failed in its burden because it did not prove that there was any visible harm to Lester.

### The conviction

{¶ 27} The trial judge, in pronouncing judgment, expressly stated: "*[E]ven disregarding the testimony here today of [Lester]*, the Court finds that there has been ample and sufficient evidence to support the State's claim and * * * that [Arnold's] guilt has been proven beyond a reasonable doubt * * *." (Emphasis

added.)  The judge then imposed a sentence of 150 days' incarceration in the Wood County Jail with no probation.[3]

***The appeal***

{¶ 28} In Arnold's appeal to the Third District Court of Appeals, he asserted four claims of error:

[1] The trial court abused its discretion and the prosecuting attorney wrongly and improperly advised the state's own key witness that he (Lester Arnold, the alleged victim) had no right to invoke his privilege under the Fifth Amendment of the United States Constitution, to not testify, regarding Lester Arnold's expressed under oath statement that "I have a right from self-incrimination under the Fifth Amendment and I do have a right to refuse to testify," with the trial court effectually and repeatedly denying same, and otherwise advising the witness of contempt of court, thereby resulting in reversible error.

[2] Defendant-appellant was denied a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution, by the trial court's repeated pattern of demonstrating that it had prejudicially presumed the defendant-appellant's guilt throughout the course of the trial, thereby resulting in reversible error.

[3] The verdict of the trial court was against the manifest weight of the evidence, thereby resulting in reversible error.

---

[3] Arnold then had an outburst, denouncing his sentence as unconstitutional.  Only then did the judge threaten to hold him in contempt—a threat that was not improper under the law and a threat that had nothing to do with Lester's assertion of the right against self-incrimination.

[4] The trial court reversibly erred by allowing state's witness Lester Arnold to read from his written statement to the police, over defense objection, into evidence at trial, thereby denying defendant-appellant's fundamental right to confront witnesses under the Sixth and Fourteenth Amendments to the Constitution of the United States, as state's witness Lester Arnold had already invoked his Fifth Amendment privilege and had testified that he didn't remember what had happened, and therefore couldn't be cross-examined or otherwise confronted about his written statement, State's Exhibit A.

2014-Ohio-1134, ¶ 6.

{¶ 29} In a divided decision, with one judge concurring in judgment only and one judge dissenting, the court of appeals affirmed his convictions. We granted discretionary review. *State v. Arnold*, 140 Ohio St.3d 1414, 2014-Ohio-3785*,* 15 N.E.3d 883.

## ANALYSIS

### *The Claims Based on the Constitutional Right Against Self-Incrimination*

{¶ 30} The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution declare that no person shall be compelled in any criminal case to be a witness against himself.

{¶ 31} As courts have long recognized, the privilege against self-incrimination is accorded liberal construction in favor of the right it was intended to secure. *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), *overruled in part on other grounds, Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The right it was intended to secure is the right of an individual to force the state to produce the evidence against him or her by its own labor, not by forcing the individual to produce it from his or her

own lips. *State v. Goff,* 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 43. Although the right against testimonial compulsion provides protection to the accused, it also applies to witnesses who would incriminate themselves by giving responses to questions posed to them. *Malloy v. Hogan,* 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Ex Parte Frye,* 155 Ohio St. 345, 349, 98 N.E.2d 798 (1951).

{¶ 32} The right is personal, not proprietary. The Fifth Amendment privilege always adheres to the *person*, not to the *information* that may incriminate the person. *Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). As Justice Holmes succinctly stated, "A party is privileged from producing the evidence, but not from its production." *Johnson v. United States*, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913).

{¶ 33} With these principles in mind, we first address the issue of Arnold's standing to raise a claim based on the purported denial of Lester's Fifth Amendment right against self-incrimination.

{¶ 34} Judge Shaw in the appellate court concluded that Arnold had no standing to raise any claim based on an alleged violation of Lester's Fifth Amendment right against self-incrimination. 2014-Ohio-1134, at ¶ 25 ("Simply put, Arnold has no standing to raise any supposed violation of the Fifth Amendment rights of another State's witness and, in any event, Arnold is unable to establish that any comment by the State or the trial court, especially in a bench trial, created reversible error"). We agree.

{¶ 35} "[A]t trial, a defendant can neither assert the Fifth Amendment right against self-incrimination on behalf of a witness, nor, if the witness himself asserts his privilege, take advantage of an error of the court in overruling it." *United States v. Fredericks*, 586 F.2d 470, 481 (5th Cir.1978). "The party, as contrasted to the witness, simply lacks standing." *United States v. Skolek*, 474 F.2d 582, 584 (10th Cir.1973).

**{¶ 36}** The concurring opinion disagrees that Arnold lacked standing. But the only authority for the notion that Arnold had standing to assert Lester's claim against self-incrimination is the same case upon which one of the dissent relies, *State v. Dinsio*, 176 Ohio St. 460, 200 N.E.2d 467 (1964). That reliance by both justices is, at best, misplaced.

**{¶ 37}** The rule of *Dinsio* is expressly limited to cases in which "the privilege of immunity from self-incrimination *is properly established*." (Emphasis added.) *Id.* at syllabus. Here, the concurring opinion agrees that there was no showing that Lester properly established the privilege.

**{¶ 38}** Moreover, nothing in *Dinsio* suggests that the issue of standing was litigated or even raised in the court. The fact that the court addressed the merits of Dinsio's claims does not mean that the court found that Dinsio had standing. This is particularly true given that *Dinsio* predates the United States Supreme Court's determinative decisions on standing by over two decades, *see, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992),[4] and federal appellate decisions like *Skolek* and *Fredericks* by about ten years.

**{¶ 39}** Finally, the key in *Dinsio* was the fact that the prosecutor, after the witness claimed the privilege, used the witness's prior statement to ask him a series of questions in what amounted to an effort to force the witness to repeatedly assert his right *in the presence of a jury* and to allow the jury to hear "innuendo evidence or inferences of evidence" that the state could not get from the witness directly. *Id.* at 468. *Dinsio* is thus far from the facts of this cause because unlike a jury, a judge in a bench trial is presumed not to have considered improper evidence in reaching

---

[4] We acknowledge that the *Lujan* case addressed standing to sue rather than standing to object, but the principles underlying each are similar. Both versions of standing involve the right of a party who has suffered actual injury traceable to the conduct of another party (in this case, the state) to seek redress from the court.

a verdict. Indeed, we have long accepted " 'the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *State v. Post,* 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987), quoting *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). Here, there is no showing that the presumption should not apply, particularly given that the judge in this trial expressly disavowed considering Lester's testimony in reaching the verdict, and the judge properly heard the contents of the statement through the testimony of other witnesses at trial.

{¶ 40} Properly understood, *Dinsio* cannot reasonably be read to establish any point of law regarding standing. It therefore cannot be cited for the proposition that any defendant, including Arnold, has standing to raise a personal privilege belonging to a witness presented against him. And neither the parties nor the other members of this court have identified any other case that establishes standing.

{¶ 41} All of that said, in this case Judge Shaw's decision on standing came only after he had already rejected Arnold's claim on the merits:

> [Lester's] only reason for invoking the "privilege" was in order to not testify against his son, Arnold, as Lester did not want Arnold charged in the first place. Nothing in the record establishes how Lester was remotely in danger of giving testimony that would incriminate himself. Therefore, there was nothing improper, either in the State's questioning or the court's admonishment that Lester could be held in contempt for refusing to answer.

*Id*. at ¶ 24.

{¶ 42} In light of the fact that Judge Shaw's decision reached the merits, we address the merits as well.

**{¶ 43}** As Judge Shaw in the appellate court properly recognized, " '[t]here is no absolute right to invoke the Fifth Amendment.' " 2014-Ohio-1134, ¶ 22, quoting *In re High Fructose Corn Syrup Antitrust Litigation*, 293 F.Supp.2d 854, 859 (C.D.Ill.2003). The protections against self-incrimination "must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), citing *Mason v. United States*, 244 U.S. 362, 365, 37 S.Ct. 621, 61 L.Ed. 1198 (1917). The cloak of the Fifth Amendment shields a person from answering a question only when the question presents " 'substantial and "real," and not merely trifling or imaginary, hazards of incrimination.' " *United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), quoting *Rogers v. United States,* 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344 (1951), and *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). In other words, the right to decline answers to specific questions applies only when the danger of self-incrimination is

> "real and appreciable, with reference to the ordinary operation of law in the ordinary course of things, not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct."

*Mason* at 365-366, quoting *Regina v. Boyes,* 1 Best & S. 311, 330 (1861).

**{¶ 44}** The burden on the witness claiming self-incrimination is not an onerous one, but the witness must assert something more than "chimerical fears." *United States v. Castro,* 129 F.3d 226, 229 (1st Cir.1991). At the very least, the proponent must establish that he or she is faced with some authentic, objectively reasonable danger of incrimination. *Hoffman,* 341 U.S. at 486-487, 71 S.Ct. 814,

95 L.Ed. 1118; *In re High Fructose Corn Syrup Antitrust Litigation*, 293 F.Supp.2d at 859, citing *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663-664 (7th Cir.2002).  As the Sixth Circuit explains,

> Short of uttering statements or supplying evidence that would be incriminating, a witness must supply personal statements under oath or provide evidence with respect to each question propounded to him to indicate the nature of the criminal charge which provides the basis for his fear of prosecution and, if necessary to complement non-testimonial evidence, personal statements under oath to meet the standard for establishing reasonable cause to fear prosecution under this charge.  Statements under oath, in person or by affidavit, are necessary because the present penalty of perjury may be the sole assurance against a spurious assertion of the privilege. Argument may be supplied by counsel but not the facts necessary for the court's determination.

*In re Morganroth*, 718 F.2d 161, 169-170 (6th Cir.1983).

**{¶ 45}** Recognizing that a witness "is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination," we also stress that "[i]t is for the court to say whether his silence is justified, * * * and to require him to answer if 'it clearly appears to the court that he is mistaken.' " *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814, 95 L.Ed. 1118, citing *Rogers*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344, and quoting *Temple v. Commonwealth*, 75 Va. 892, 899 (1881).  Indeed, the trial court has a clear duty to determine whether a direct answer to the question may reasonably have a tendency either to incriminate the witness or to furnish proof

of an element or link in the chain of evidence necessary to convict the witness of a crime. *See Hoffman* at 486–487.

{¶ 46} In considering claims of the privilege against self-incrimination, the trial courts must be mindful that "the Fifth Amendment's prophylaxis is not available to all comers in all circumstances merely because they have the presence of mind to chant the accepted constitutional liturgy." *Castro,* 129 F.3d at 229. A trial court must ensure that the proponent of the privilege provides the basis for asserting the privilege and evidence to support that claim (e.g., personal statements under oath) so that the court may determine whether a direct answer might tend to incriminate the witness, *see, e.g., Morganroth,* 718 F.2d at 167, and thus that the witness's silence is "justified." *Hoffman* at 486; *see also McGorray v. Sutter*, 80 Ohio St. 400, 89 N.E. 10 (1909), paragraph two of the syllabus.

{¶ 47} The trial court's inquiry into the basis of a witness's assertion of the privilege is critical, even when the purported basis seems implausible, frivolous, or suspect. The trial court must tread lightly, of course, because "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814, 95 L.Ed. 1118. Thus, the trial court "must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment" in its analysis of the propriety of the claim. *Sec. & Exchange Comm. v. Graystone Nash, Inc.,* 25 F.3d 187, 192 (3d Cir.1994). And the record of the trial court's proceedings should clearly reflect the court's inquiries into the bases of the claim of privilege and the proponent's responses.

{¶ 48} The record before us does not reflect an ideal inquiry by the trial court. Nevertheless, when defense counsel objected to Lester's reading of his statement to police, the judge asked him to articulate the basis for the objection.

Counsel answered that "the witness has invoked his Fifth Amendment privilege." The prosecutor pointed out that no basis for the privilege had been offered. In response, defense counsel was unable to furnish any coherent basis for honoring Lester's assertion of the privilege. We have little trouble concluding that neither Lester nor Arnold met the minimum burden of establishing that the information that the state sought to elicit from Lester, in the form of a prior statement Lester made to police contemporaneous to the incident, would violate Lester's right against self-incrimination. Defense counsel was unable to articulate any basis at all. The record reveals not one iota of evidence or other information adduced during Lester's appearance on the stand, or at any point during trial, suggesting that Lester had violated any law in giving the police the statement or that he would violate any law or otherwise incriminate himself by reading his statement at trial. In the words of Lord Chief Justice Cockburn, Lester presented, at best, " 'a merely remote and naked possibility' " of self-incrimination, which is far below the quantum sufficient to raise the privilege. *Brown v. Walker*, 161 U.S. 591, 600, 16 S.Ct. 644, 40 L.Ed. 819 (1896), quoting *Boyes*, 1 Best & S. at 330.

{¶ 49} Even if we assume for purposes here that the trial court committed error by not inquiring more fully into Lester's purported fear of self-incrimination, we would still affirm the judgment of the appellate court because any error in the trial court's inquiry into the privilege was harmless beyond a reasonable doubt.

{¶ 50} We recently described Ohio's harmless-error review standards as they are set forth in Crim.R. 52(A):

> Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the *government* bears the burden of demonstrating that the error did not

affect the substantial rights of the defendant." (Emphasis sic.) *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15, citing *United States v. Olano,* 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In most cases, in order to be viewed as "affecting substantial rights," " 'the error must have been *prejudicial.*' (Emphasis added.)" *State v. Fisher,* 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *Olano* at 734. Accordingly, Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result. *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24–25.

*State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, 1265, ¶ 36. We then set forth a three-point analysis to determine whether an alleged error affected the substantial rights of the defendant and requires a new trial. The reviewing court must ascertain (1) whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict, (2) whether the error was not harmless beyond a reasonable doubt, and (3) whether, after the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 37.

{¶ 51} Assuming that the trial court erred as Arnold contends,[5] we conclude beyond any reasonable doubt that Arnold was not prejudiced by any error in the admission of Lester's written statement and testimony and that the admission of

---

[5] To the extent that one of the dissenting opinions relies on an undeveloped hearsay analysis, we note that Arnold did not object on hearsay grounds when Lester read the statement at trial, nor did he raise that claim in the court of appeals or in this court. Even if that argument had been preserved for this court's review, there is no reason to believe that the statement could not be admitted properly under one or more of the many exceptions to the hearsay rule.

that testimony, even if in error, had no impact on the verdict.[6]   We also conclude that the remaining evidence admitted at trial established Arnold's guilt beyond any reasonable doubt.

{¶ 52} We are cognizant that the trial court judge was "in the best position to consider whether, in the particular factual circumstances, a responsive answer to the question or an explanation of why it cannot be answered could be harmful to the witness." *Ryan v. Internal Revenue Commr.*, 568 F.2d 531, 539 (7th Cir.1977); *see also State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus ("the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts").  In the context of this case, the judge easily could have determined that Lester was, as Judge Shaw noted in the court of appeals, improperly attempting to invoke the privilege "in order to not testify against his son." 2014-Ohio-1134, ¶ 24.  This is not a sufficient basis on which to assert the privilege against self-incrimination. *Rogers,* 340 U.S. at 440-441, 71 S.Ct. 438, 95 L.Ed. 344, quoting *United States v. Murdock,* 284 U.S. 141, 148, 52 S.Ct. 63, 76 L.Ed. 210 (1931), and *Hale v. Henkel,* 201 U.S. 43, 69, 26 S.Ct. 370, 50 L.Ed. 652 (1906) (the decisions of the Supreme Court "are explicit in holding that the privilege against self-incrimination 'is solely for the benefit of the witness' " and 'is purely a personal privilege of the witness' and that declining to answer in "a desire to protect others from punishment" is an "untenable ground" for asserting the privilege against self-incrimination).  Thus, any error that the trial court committed in failing to conduct a detailed inquiry into the basis for Lester's invocation of the Fifth Amendment was harmless in this case beyond a reasonable

---

[6] The trial court expressly stated that the government had met its burden *even without* Lester's testimony.  We agree and find no reasonable possibility that the challenged testimony might have contributed to the verdict. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78.

doubt. Even if the judge had inquired further, the likelihood of his finding any objectively reasonable basis for the privilege was remote at best.

{¶ 53} Here, there is no showing that the presumption that the trial judge considered only relevant, material, and competent evidence in reaching a verdict should not apply, particularly given that Lester neither adopted nor endorsed his prior statement and testified that he could not recall making it. And the trial court judge, in pronouncing judgment, expressly stated that even without Lester's testimony, the state had met its burden. The contents of the statement had been established through the testimony of other witnesses at trial.

{¶ 54} Lastly, Judge Shaw in the appellate court found that Lester's statement was "merely cumulative" of other evidence and therefore harmless. 2014-Ohio-1134, ¶ 42. Having reviewed the record, we agree.

{¶ 55} We conclude that Arnold was neither prejudiced by the trial court's inquiry into Lester's claim of privilege, nor by the trial court's instruction to Lester to read his statement during his examination. Any error in the handling of the purported privilege was harmless beyond a reasonable doubt. *Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, at ¶ 36.

### The "fair trial" and manifest-weight claims

{¶ 56} Of primary relevance to us are the appellate court's holdings on Arnold's Fifth and Sixth Amendment claims. Arnold's appeal to us asserted on its face three constitutional claims: that the trial court violated (1) Lester's right against self-incrimination under the Fifth Amendment, (2) Arnold's right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments, and (3) Arnold's right to confront witnesses against him, as guaranteed by the Sixth Amendment. Arnold's argument in the fair-trial proposition, however, is essentially a manifest-weight claim. Indeed, he expressly states that the manifest-weight claim is presented as "a corollary" to his claim asserting violation of the Sixth and Fourteenth Amendments based on alleged judicial bias. And Arnold fails to proffer

20

a single legal citation in support of his fair-trial claim to this court. We proceed with our analysis accordingly.

{¶ 57} Arnold asserts that the trial court "indicated that it had prejudicially presumed the defendant-appellant's guilt by its comments and conduct" during trial. In support of that contention, Arnold cites an isolated instance in which the trial court *sustained* his objection, on hearsay grounds, to Officer Bethel testifying on direct examination as to what Connie told him when he arrived on the scene. After the state attempted to overcome the hearsay objection by arguing that Officer Bethel's testimony was admissible as a present-sense impression, defense counsel stated to the court, "I would indicate that, uhm, it's still, it's not an excited utterance and it's still—." The trial court then stated, "I'm sure we'll be getting to some excited utterances soon." Based on the court's statement, Arnold contends that "the trial court indicated its bias with regard to the future of evidence not yet offered and not yet heard, by improperly and prejudicially predicting [that] 'we'll be getting to some excited utterances soon.' " Like Judge Shaw in the court of appeals, we disagree, finding that nothing in that exchange alone presents a showing of judicial bias. 2014-Ohio-1134, ¶ 29-30.

{¶ 58} Arnold, however, also asserts:

> When taken in the context and against the backdrop of the trial court's repeated ignoring and overruling of the right of State's witness Lester Arnold to invoke his Fifth Amendment privilege, it reveals that the trial court has already decided where it wants this case to go, in favor of the State, and hence, the trier of facts' prediction which would otherwise be unthinkable in the mind of a fair and impartial trier of facts, was prejudicially sure to be getting to some excited utterances soon.

> And in conclusion, both literally and figuratively, and as if to make its points of the *fait accompli*, the trial court improperly assumed an adversarial, prosecutorial role during the defense's closing argument, and interrupted same on numerous occasions, thereby abandoning any pretense of fairness and impartiality. To wit, the trier of facts never once interrupted the prosecuting attorney's closing argument or rebuttal closing argument.
>
> Yet the trier of facts went out of its way to demean and berate the fact that the alleged victim, Lester Arnold, had no signs whatsoever of any physical harm, which would logically follow that there was no attempt made to cause physical harm.

(Underlining sic.)

{¶ 59} Arnold's claim that the trial court "improperly assumed an adversarial, prosecutorial role during the defense's closing argument" is based on the trial court's interruption when defense counsel argued in closing that there was insufficient evidence to sustain a domestic-violence conviction because there was no forensic evidence, photographs, or testimony by Connie establishing that Lester sustained actual physical harm. The court's inquiry—"Is that a requirement under the statute * * *?"—was a fair one in the context of this bench trial.

{¶ 60} But after defense counsel agreed that there was no requirement that the victim sustain actual physical harm, he continued to argue that the lack of evidence of physical harm meant that the state had not met its burden of proof, and the following exchange took place:

> THE COURT: [A]re we gonna talk in riddles here or are you gonna be—I mean, I understand what you're arguing for, but there is no requirement of a showing of physical harm, correct?

[DEFENSE COUNSEL]: Cause or attempt to cause physical harm—

THE COURT: Correct.

[DEFENSE COUNSEL]: —is the requirement. And I'm respectfully submitted—

THE COURT: No gushing blood. No broken bones. No bruises. No gunshot wounds, right?

[DEFENSE COUNSEL]: Your Honor, I respectfully submit that the State has not shown beyond a reasonable doubt that there was any attempt to cause harm or physical harm to Mr. Les Arnold.

**{¶ 61}** Judge Shaw in the appellate court concluded that the trial court was not taking an impermissibly biased, adversarial role against Arnold's counsel, stating that the trial court's repeated inquiries into whether physical harm was required under R.C. 2919.25(A) were prompted by defense counsel's repeated argument that the state had not proven its case because there was no showing that Lester was physically harmed.

**{¶ 62}** We agree with Judge Shaw's conclusion that "it is clear that the court was attempting to clarify the legal language of the statute at issue." 2014-Ohio-1134, ¶ 32. We also agree with his observation that "[w]hile the court perhaps did not need to inquire of Arnold's counsel regarding this matter during closing arguments," in a bench trial, the inquiries were not improper or prejudicial, "as there was ample proof that Arnold *attempted* to cause physical harm to his father, Lester Arnold." (Emphasis sic.) *Id.*

**{¶ 63}** Having reviewed the trial court transcript in its entirety, and in the absence of any additional evidence that the trial court was impermissibly biased against Arnold or his counsel, we conclude that Arnold has failed to sustain his burden of establishing an impermissible judicial bias that deprived him of a fair

trial, *see State v. Wade*, 53 Ohio St.2d 182, 188, 373 N.E.2d 1244 (1978), or that his conviction is infirm by evidentiary standards. " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), quoting *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

### *The Claims Based on the Sixth Amendment's Right to Confrontation*

{¶ 64} Arnold presents us with a summary argument asserting that his right to confront witnesses under the Sixth Amendment was violated when the trial court allowed Lester to read his prior statement at trial. Arnold supports his assertion as follows:

> [T]he trial court committed reversible error, on grounds that the State's witness testified that he could not remember the substantive nature of what he had written in said statement, thereby rendering any meaningful cross-examination about the written statement as being impossible, and therefore violating the Confrontation Clause of the Sixth Amendment to the United States Constitution, as applicable to the states through the due process clause of the Fourteenth Amendment to the United States Constitution. *State v. Goff*, 2005-Ohio-339, at 345. Also, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, at 1378 (2004) (unanimous decision).

(Underlining sic.)

**{¶ 65}** Arnold did not raise this claim to the trial court, and the claim is thus waived unless plain error is shown. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 181. "An alleged error is plain error only if the error is 'obvious,' *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and 'but for the error, the outcome of the trial clearly would have been otherwise.' *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus." *Id*.

**{¶ 66}** Like Judge Shaw in the appellate court, we do not see how the admission of the statement, in the context in which Lester read it, violates Arnold's rights under the Confrontation Clause. After all, Lester, the witness, was present in open court and confronted about his prior statement by all concerned: the state, the court, and defense counsel. That is all the Sixth Amendment requires here.

> [W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is therefore irrelevant that the reliability of some out-of-court statements " 'cannot be replicated, even if the declarant testifies to the same matters in court.' " *Post,* at 1377 (quoting *United States v. Inadi,* 475 U.S. 387, 395, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. (The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).)

*Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn. 9.

**{¶ 67}** The concurring opinion ignores the plain-error standard and relies on Confrontation Clause cases that are inapposite in the context we face here. For example, *Douglas v. Alabama* is best known for making the Sixth Amendment's Confrontation Clause applicable to the states. *See Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). More importantly, *Douglas* is wholly distinguishable from the facts of this case in significant ways:

[Douglas] and one Loyd were tried separately in Alabama's Circuit Court on charges of assault with intent to murder. Loyd was tried first and was found guilty. The State then called Loyd as a witness at petitioner's trial. Because Loyd planned to appeal his conviction, his lawyer, who also represented petitioner, advised Loyd to rely on the privilege against self-incrimination and not to answer any questions. When Loyd was sworn, the lawyer objected, on self-incrimination grounds, "to this witness appearing on the stand," but the objection was overruled. Loyd gave his name and address but, invoking the privilege, refused to answer any questions concerning the alleged crime. The trial judge ruled that Loyd could not rely on the privilege because of his conviction, and ordered him to answer, but Loyd persisted in his refusal. The judge thereupon granted the State Solicitor's motion "to declare (Loyd) a hostile witness and give me the privilege of cross-examination." The Solicitor then produced a document said to be a confession signed by Loyd. Under the guise of cross-examination to refresh Loyd's recollection, the Solicitor purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the

26

jury, "Did you make that statement?" Each time, Loyd asserted the privilege and refused to answer, but the Solicitor continued this form of questioning until the entire document had been read. The Solicitor then called three law enforcement officers who identified the document as embodying a confession made and signed by Loyd. Although marked as an exhibit for identification, the document was not offered in evidence.

(Footnotes omitted.) *Douglas,* 380 U.S. at 416-417, 85 S.Ct. 1074, 13 L.Ed.2d 934. No wonder the high court had little trouble concluding that "[i]n the circumstances of this case, [Douglas's] inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* at 419. Here, however, we have a very different set of facts: there was no jury; Lester, unlike Loyd, was not a defendant; there was no discernible threat that he would ever be charged for a crime related to the incident; and there was no "guise" of cross-examination.

{¶ 68} The other case cited by the concurring opinion reiterates a critical aspect of a Confrontation Clause analysis that is dispositive here: "[T]he Confrontation Clause guarantees only ' "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (Emphasis sic.) *United States v. Owens*, 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)]; and citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Ohio v. Roberts,* 448 U.S. 56, 73, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), fn. 12.

**{¶ 69}** Although the concurring opinion cites this standard, it never addresses how the right to confront a witness is denied when, as happened in this case, a witness is asked, *by defense counsel,* why the witness can't recall a prior statement and the witness answers that he could not see or hear well and that he had a high "blood sugar level" and PTSD. As *Owens* suggests, an effective cross-examination that elicits the existence of bias, sensory deprivation, or memory loss is an effective and constitutionally permissible way to confront the witness:

> The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee. They are, however, realistic weapons, as is demonstrated by defense counsel's summation in this very case, which emphasized [the victim's] memory loss * * *.

*Owens*, 484 U.S. at 560, 108 S.Ct. 838, 98 L.Ed.2d 951.

**{¶ 70}** Even assuming solely for the sake of argument that the admission of this evidence was error, we again find that error to be harmless beyond a reasonable doubt given that this was a bench trial, that the trial judge expressly disavowed any consideration of Lester's statement in rendering judgment, and that other properly admitted evidence supported beyond a reasonable doubt each element of the offense of which Arnold was convicted. *Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, at ¶ 37.

## CONCLUSION

**{¶ 71}** Having been presented with nothing to demonstrate any violation of the right against self-incrimination, the right to a fair trial, the right to confront witnesses, or any other reversible error, we affirm the judgment of the court of appeals.

Judgment affirmed.

PFEIFER and KENNEDY, JJ., concur.

FRENCH, J., concurs in judgment with an opinion.

O'DONNELL, J., dissents with an opinion.

LANZINGER, J., dissents with an opinion.

O'NEILL, J., dissents with an opinion.

_____

**FRENCH, J., concurring in judgment.**

{¶ 72} I join the majority in affirming the judgment of the court of appeals and upholding the conviction of appellant, Jeffrey Arnold. However, I disagree with the majority's analysis on two points.

{¶ 73} First, I disagree with the majority's conclusion that Arnold lacked standing to raise any claim based on an alleged violation of Lester Arnold's Fifth Amendment right against self-incrimination. Majority opinion at ¶ 34. Arnold did not attempt to assert a Fifth Amendment right on behalf of his father. Rather, Arnold argued that he himself was unfairly prejudiced by the improper admission of Lester's written statement and testimony after Lester invoked the privilege. This court has evaluated similar challenges to the admission of witness testimony after an assertion of privilege without inquiring into defendant's standing to raise such a claim. *See, e.g., State v. Dinsio,* 176 Ohio St. 460, 200 N.E.2d 467 (1964) (trial court erred in allowing prosecution to continue line of questioning after witness properly asserted privilege against self-incrimination). I would therefore conclude that Arnold had standing to challenge the trial court's admission of Lester's testimony on Fifth Amendment grounds. However, I agree with the majority that the trial court did not abuse its discretion in admitting Lester's testimony because he did not establish reasonable cause to apprehend a real danger of self-incrimination.

**{¶ 74}** I also disagree with the majority's analysis of Lester's availability for cross-examination for Confrontation Clause purposes. The Confrontation Clause of the Sixth Amendment to the United States Constitution bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Where a witness relies on his privilege against self-incrimination and refuses to testify, the defendant's "inability to cross-examine [the witness] as to the alleged [out-of-court statement] plainly denie[s] him the right of cross-examination secured by the Confrontation Clause." *Douglas v. Alabama,* 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). *See also United States v. Owens*, 484 U.S. 554, 562, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) ("assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination * * * no longer exists").

**{¶ 75}** The majority concludes that the admission of Lester's prior written statement did not violate Arnold's rights under the Confrontation Clause because Lester testified in open court. Majority opinion at ¶ 66. However, Lester invoked the Fifth Amendment privilege. Notwithstanding the validity of that assertion, he was an unavailable witness for Confrontation Clause purposes. The Confrontation Clause therefore requires us to determine whether Lester's prior written statement was a testimonial or nontestimonial statement. " 'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.' " *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 30, quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Statements are " 'testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove

past events potentially relevant to later criminal prosecution.' " *Id.*, quoting *Davis* at 822. The admission of Lester's out-of-court written statement passes constitutional muster only if the statement was nontestimonial. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 143. The majority skips over this inquiry and concludes that allowing Lester to read his prior written statement at trial did not violate Arnold's right to confrontation.

{¶ 76} Nevertheless, I ultimately agree with the majority in affirming Arnold's conviction. Even if the trial court erred in admitting Lester's prior written statement in violation of Arnold's right to confrontation, the error was harmless because other properly admitted evidence supported Arnold's conviction beyond a reasonable doubt. I therefore concur in the judgment of the majority upholding Arnold's conviction.

_____

**O'DONNELL, J., dissenting.**

{¶ 77} Respectfully, I dissent.

{¶ 78} The trial court disregarded its duty to appraise the propriety of Lester Arnold's assertion of his Fifth Amendment privilege against self-incrimination, errantly compelled Lester to read aloud a statement he made concerning his son, Jeffrey Arnold, the defendant, and then admitted the statement into evidence, thereby affecting Jeffrey's rights.

{¶ 79} The Fifth Amendment privilege against self-incrimination is confined "to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.E. 1118 (1951). Once a witness asserts the privilege, "[i]t is for the court to say whether his silence is justified, * * * and to require him to answer if '*it clearly appears to the court that he is mistaken.*' " (Emphasis added.) *Id.*, quoting *Temple v. Commonwealth*, 75 Va. 892, 899 (1881). "The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the

case as by the facts actually in evidence.' " *Id.* at 487, quoting *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio 1896).

{¶ 80} The majority states that "[t]he record before us does not reflect an ideal inquiry by the trial court" into the basis of Lester's claim of privilege. Majority opinion at ¶ 48.

{¶ 81} The record reflects *no inquiry* by the trial court on this subject. Lester was the first witness called to testify, and when he initially asserted the privilege against self-incrimination, the trial court knew that Jeffrey was accused of committing domestic violence against him, and the facts in evidence showed that Jeffrey was Lester's son, that he lived with his parents, and that police had been dispatched to the family home sometime in the spring of 2013.

{¶ 82} The trial court could not have discerned from that information that Lester was clearly mistaken about his right to assert the privilege or whether Jeffrey or Lester had been the aggressor. Nonetheless, instead of inquiring into the basis of the claim, the court immediately advised Lester that he could be held in contempt for failing to answer questions and allowed the state to continue questioning him. Lester then refused to answer questions about a written statement he had given to police while sitting in the front seat of a police vehicle and stated that he did not remember giving such a statement, and the court used the refusal as a reason to compel him to read the statement aloud and admitted it into evidence. After reading the statement, Lester never testified that he remembered giving it and only recalled telling an officer that he did not want his son arrested or charged and that he and his son just needed some space between them.

{¶ 83} The majority concludes that the admission of the statement did not violate Jeffrey's Sixth Amendment right to confront witnesses and also concludes that "there is no showing that the use of [Lester's] prior statement was improper." Majority opinion, ¶ 16, fn. 2 (relying on Evid.R. 613(B), which permits use of extrinsic evidence of a prior inconsistent statement under certain circumstances if

the statement "is offered *solely* for the purpose of impeaching the witness," (emphasis added) and further relying on an opinion of the Second District Court of Appeals interpreting that rule).

**{¶ 84}** Although Jeffrey challenges the statement on Sixth Amendment grounds, it is "well settled that this court will not reach constitutional issues unless absolutely necessary," *State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 9, and in this case, that is not necessary.

**{¶ 85}** The state did not request that Lester read his statement or that the trial court admit it into evidence solely to impeach him. Rather, here, the state offered his out of court statement to prove the truth of the matter asserted therein— that Jeffrey attempted to cause physical harm to Lester. The statement is hearsay as defined by Evid.R. 801(C), and no hearsay exception applies in this instance.

**{¶ 86}** The trial court's decision to compel Lester to read his statement and admit it into evidence violated the Ohio Rules of Evidence and constituted plain error affecting Jeffrey's substantial rights. *See* Crim.R. 52(B). As the dissenting judge in the court of appeals observed, without the testimony and the statement of Lester:

> It is undisputed that some sort of encounter happened between [Jeffrey] Arnold and Lester, but we have no indication as to who was the actual aggressor. We have an excited utterance by Lester that Arnold punched Lester in the head and attempted to choke him. * * * However, the officer testified that Lester had no visible injuries at the time of incident. No witness actually witnessed the event in question, and no evidence was offered that Arnold was the aggressor.

2014-Ohio-1134, ¶ 59 (Rogers, J., dissenting).

**{¶ 87}** This evidence is insufficient to support Jeffrey's conviction for domestic violence beyond a reasonable doubt. Based on these facts, I would reverse the judgment of the court of appeals.

―――――――――

**LANZINGER, J., dissenting.**

**{¶ 88}** This is simply a municipal court case where the alleged victim, Lester Arnold, father of the defendant, Jeffrey Arnold, had a change of heart and did not wish to testify against his son on an assault charge. When called to the stand, Lester attempted to invoke the Fifth Amendment protection of the right against self-incrimination.

**{¶ 89}** This is a fact-specific case that, despite the treatise of the lead opinion, articulates no new legal principle. A witness may indeed have reason to invoke the Fifth Amendment protection to remain silent, even during a bench trial. It is the duty of the court to determine whether the privilege is justified under the circumstances. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *State v. Landrum*, 53 Ohio St.3d 107, 120, 559 N.E.2d 710 (1990). No bright-line rule can tell us whether answering a question would cause injurious disclosure to the witness; yet at the very least the court must inquire to ensure that the witness is invoking the privilege properly, which in this case it did not do.

**{¶ 90}** In my view, this is a case of error correction only, and I would hold that the matter was improvidently accepted.

―――――――――

**O'NEILL, J., dissenting.**

**{¶ 91}** Respectfully, I must dissent.

**{¶ 92}** I agree that with regard to Lester's Fifth Amendment claims, the "record before us does not reflect an ideal inquiry by the trial court." However, this matter presents a good opportunity to explain the duty of a trial court to take affirmative steps to determine the validity of the Fifth Amendment claims of any

witness. *Hoffman v. United States*, 341 U.S. 479, 486-487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *United States v. Melchor Moreno,* 536 F.2d 1042, 1046 (5th Cir.1976). If the trial court had simply taken Lester aside and had a frank in camera discussion, allowing him to "allude in very general, circumstantial terms to the reasons why he feels he might be incriminated," the bench trial might have proceeded smoothly. *Melchor Moreno* at 1046. Instead, I believe that the trial court erroneously left Lester to prove that he was entitled to the Fifth Amendment privilege "in the sense in which a claim is usually required to be established in court" and that as a result Lester was "compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman* at 486.

{¶ 93} I disagree with the majority that the Fifth Amendment claims of a state's witness are wholly irrelevant to a criminal defendant. This is not a case where a party is claiming the privilege against self-incrimination on behalf of a witness who could not or had not claimed it. *E.g., Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974) (law-firm partner called as grand-jury witness cannot claim his own privilege as basis for refusing to produce records of law firm); *Couch v. United States*, 409 U.S. 322, 329, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (taxpayer may not claim privilege to prevent her accountant from producing taxpayer's records in accountant's possession). Rather, in this case it is clear from the record that Lester, the witness, unequivocally claimed his own privilege.

{¶ 94} The bottom line is that Lester's statement to the police was an out-of-court statement offered for the truth of the matter asserted. That makes the statement hearsay, and absent an exception it is inadmissible. The trial court's order to read the statement unfairly prejudiced Arnold because it allowed the state to override Lester's claim of privilege and compel him to read an otherwise inadmissible statement into the record. We have considered a similar problem in the past. *See State v. Dinsio*, 176 Ohio St. 460, 200 N.E.2d 467 (1964). In *Dinsio*, a witness for the state refused to answer questions, invoking his privilege against

self-incrimination. The prosecutor then proceeded to question the witness about a prior written statement regarding criminal acts of the defendant as if on cross-examination. The state asked the witness about each line of the statement, and the witness invoked the privilege against self-incrimination in response to each question. We held that this was error prejudicial to the defendant because the questions themselves allowed the jury to draw inferences regarding facts that the state was prohibited from eliciting from the witness by direct questioning. *Id.* at 467-468. We did not cast this as a constitutional error then, *id.* at 467, and we do not need to do so now. Both cases are properly resolved under the standards regarding erroneous admission of evidence.

{¶ 95} Arnold was prejudiced by a mechanism similar to the one in *Dinsio*. After a long series of questions, it became clear to the state that Lester would not be a helpful witness on account of his belief that he was privileged to refuse to answer under the Fifth Amendment. At the state's request, the trial court used Lester's claim of the privilege against self-incrimination to justify compelling him with threats of contempt to read into evidence from an unsworn[7] writing he claimed he did not remember making. I know of no rule of evidence or procedure allowing a court to compel a witness to read an unsworn written statement into the record when the witness has professed a lack of personal knowledge regarding the content of that writing. *See State v. Arnold*, 3d Dist. Seneca No. 13-13-27, 2014-Ohio-1134, ¶ 51-58 (Rogers, J., dissenting). Inexplicably, the majority believes that ordering Lester to read this statement did not require him to adopt or endorse its content. Although the majority, like the trial court, does not see the harm in compelling Lester to read this statement into evidence, I consider the order

---

[7] In his testimony, Officer Ely claimed to have administered an oath swearing Lester to the truth of the written statement, but the statement itself does not indicate that Ely administered an oath, and the officer's signature is on a line marked "witness." Further, there is no testimony in the record showing that Officer Ely has complied with R.C. 2935.081, which provides the authority for peace officers to administer oaths in particular circumstances.

compelling Lester to do so, and the later order admitting the statement into evidence, to be an abuse of discretion.

{¶ 96} I further disagree that this matter is one where the presumption that a judge in a bench trial only considered proper evidence in reaching a verdict renders the error harmless. This case actually stands for the opposite principle. Absent the wrongfully admitted statement, there is no credible evidence of guilt. I believe that relying on a judge-made presumption of propriety without having the benefit of overwhelming evidence of guilt falls short of our duty to determine whether the error here was harmless "beyond a reasonable doubt." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 29. Error in the admission of testimony is harmless only when there is no reasonable possibility that the testimony contributed to the accused's conviction. *Id.* at ¶ 28; *State v. Lytle,* 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus, *vacated in part on other grounds,* 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978); Crim.R. 52(A). That is certainly not the case here.

{¶ 97} What "relevant, material, and competent evidence" of domestic violence did the trial court below solely rely on? *State v. Post,* 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987), quoting *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). A "crashing sound," a "struggling sound," some disheveled hair, and a dubiously admissible out-of-court statement that Arnold punched Lester in the head and grabbed him in a chokehold, which was made some time after the "commotion." The majority claims that the statement was merely cumulative, but I believe that it bolstered the otherwise limited evidence listed above. It is impossible therefore to "excise the improper evidence" and say that the remaining evidence alone overwhelmingly supports a verdict of guilt. *Morris* at ¶ 29. Thus, I cannot agree that there is no reasonable possibility that the testimony contributed to the accused's conviction.

{¶ 98} Respectfully, I dissent.

————————————

Timothy J. Hoover, Fostoria Law Director, for appellee.

Gene P. Murray, for appellant.

Russell S. Bensing, urging reversal for amicus curiae, Ohio Association of Criminal Defense Lawyers.

————————————