[Cite as *Harrah v. Mike Enyart & Sons, Inc.*, 2019-Ohio-64.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

TODD HARRAH,                                  :

    Plaintiff-Appellee,                     :        Case No.   18CA8

    vs.                                            :

MIKE ENYART AND SONS, INC.,          :        DECISION AND JUDGMENT ENTRY


    Defendant-Appellant.                  :

APPEARANCES:

Scott K. Sheets and Matthew L. Ward, Huntington, West Virginia, for appellant.

Brigham M. Anderson, Ironton, Ohio, for appellee.

CIVIL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED:1-7-19
ABELE, J.

{¶ 1} This is an appeal from a Lawrence County Common Pleas Court judgment in favor of Todd Harrah, plaintiff below and appellee herein.  Mike Enyart and Sons, Inc., defendant below and appellant herein, assigns the following errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED CLEAR ERROR BY UTILIZING THE 'ORDINARY INCOME' LINE FROM THE SUBCHAPTER-S CORPORATION'S FEDERAL INCOME TAX RETURN TO DETERMINE 'NET PROFITS' FOR PURPOSES OF PROFIT-SHARING CALCULATION."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ABUSED ITS DISCRETION AND OTHERWISE MADE A CLEAR ERRONEOUS FINDING BY FAILING TO ASSIGN THE PLAINTIFF-APPELLEE'S HEALTH INSURANCE COSTS AGAINST HIS PROFIT-SHARING WHEN THE TWO OTHER COMPANY EMPLOYEES WHO HAD HEALTH INSURANCE AND WHO SHARED IN COMPANY PROFITS PAID FOR THEIR HEALTH INSURANCE THROUGH THEIR PROFITS."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ABUSED ITS DISCRETION AND OTHERWISE MADE A CLEAR ERRONEOUS FINDING BY FAILING TO HAVE THE PLAINTIFF-APPELLEE REIMBURSE DEFENDANT-APPELLANT FOR THE KINGDOM MOTORCYCLE TRAILER AND GOLF CART AT ISSUE IN THE TRIAL BELOW FOR WHICH DEFENDANT-APPELLANT HAD PAID AND WHICH THE TRIAL COURT AWARDED TO PLAINTIFF-APPELLEE."

FOURTH ASSIGNMENT OF ERROR:

"THROUGH ITS FUNDAMENTAL MISTAKE IN DETERMINING DEFENDANT-APPELLANT'S NET PROFITS FOR PURPOSES OF PLAINTIFF-APPELLEE'S PROFIT-SHARING, THE TRIAL COURT ABUSED ITS DISCRETION AND OTHERWISE MADE A CLEAR ERRONEOUS FINDING BY FAILING TO AWARD DEFENDANT-APPELLANT ITS OVERPAYMENT OF PROFIT-SHARING TO PLAINTIFF-APPELLEE."

{¶ 2} In 2006, Mike Enyart incorporated Mike Enyart and Sons, Inc. In 2008, the company became financially distressed, and Mike asked his father, Bill Enyart, for a cash-infusion. Around that time, Mike made Tom Enyart, Mike's brother, a fifty-percent owner of the company. The brothers and Bill later met with appellee to discuss an employment arrangement. During the meeting, the parties entered into an oral employment and

profit-sharing agreement with appellee.

{¶ 3} Appellee later alleged that appellant failed to fulfill the terms of the parties' agreement and filed a complaint to recover the sums he alleged that appellant owed.

{¶ 4} Appellant, however, filed a counterclaim and alleged that appellee had received more than the amount due to him under the profit-sharing agreement. Appellant also requested the return of a motorcycle trailer and a golf cart in appellee's possession because, appellant asserted, both items rightfully belonged to the company. Appellant requested judgment in the amount of $83,434.48.

{¶ 5} At a trial before a magistrate, the parties primarily disputed three issues: (1) the meaning of "net profits" as contemplated under the oral profit-sharing agreement; (2) whether the parties' oral employment agreement afforded appellee health insurance; and (3) whether appellee had any remaining sums due under the profit-sharing agreement, or whether appellant had overpaid appellee.

{¶ 6} Appellee testified that in April 2008, he met with Bill, Tom, and Mike, and they verbally offered appellee a job. Appellee stated that the Enyarts agreed to match what appellee's then-employer offered him, plus ten percent of the net profits. Appellee explained that his then-employer (1) paid him $1,400 per week; (2) provided him with a company credit card, cell phone and car; and (3) paid for his health insurance. Appellee claimed that "from the minute [they] had the meeting * * * [health insurance] was pretty much set in stone."

{¶ 7} Appellee related that although the parties did not reduce their agreement to writing, he believed that the net profits would be determined based upon the company's tax returns. Appellee also testified that after he obtained health insurance, he gave the paperwork to Christie

Enyart, appellant's vice president, and Christie paid for it. Appellee further explained that while employed at appellant, he used the company's credit card to purchase a $6,300 motorcycle trailer and asked Christie to place it in the company's name. Appellee related that he had been going through a divorce at the time and did not want the trailer in his name. Appellee indicated that after he received the trailer, he spent approximately $1,200 to $1,500 to accessorize the trailer. Appellee additionally stated that while employed at appellant, appellant placed a $2 million order with a supplier. Appellee claimed that as a result of the large order, the supplier agreed to give Mike a golf membership and told Tom and appellee that they each could have a golf cart.

{¶ 8} Mike Enyart, however, testified that the parties did not discuss how appellee's profit share would be calculated. Instead, he believed the term, "net profits," meant "whatever is left over after you pay all your bills." Mike stated that the parties had not discussed how they would define, "net profits," but instead, he believed that Christie would calculate the amount of "net profits." Mike explained that he did not know how Christie computed net profits. Mike also testified that he and appellee did not discuss health insurance and that it "was between [appellant] and accounting and the office." Mike related that he did not tell appellee that health insurance premiums would be deducted from appellee's profit-sharing and that he had no discussion with his brother or father. Mike additionally stated, however, that both he and his brother, Tom, received health insurance through the company.

{¶ 9} Appellee called Christie on cross-examination and she testified that she managed the company's finances. Christie stated that appellant hired appellee in April 2008 and agreed to pay appellee ten percent of the company's net profits. Christie denied that she used the tax returns to calculate appellee's profit-share. She admitted, however, that when she gave her

deposition about a year earlier, she stated that she used the tax returns to arrive at net profit. Christie claimed that she "was * * * confused" when she gave her deposition testimony and explained that she and appellee "never looked at tax returns for anything." Christie thus stated that her deposition testimony was incorrect.

{¶ 10} Christie then testified that she used the company's financial statements to determine net profits and that she and appellee reviewed the financial statements to calculate appellee's profit-share. Christie also explained that until 2011 or 2012, the company's financial statements were not audited.

{¶ 11} Later, when appellant called Christie on direct examination, Christie related that she did not discuss with Mike or Tom the precise calculation of appellee's "net profits," but did verify that she should use the "net income" figure from the company's financial statements. Christie indicated that she did not use the company's tax returns to obtain "net income" because the company's tax returns were not complete until September or October of the following year.

{¶ 12} On cross-examination, Christie denied that she used a profit and loss statement from Quickbooks to determine the amount of appellee's profit-share, and instead claimed that she kept "like a piece of paper." Christie stated, however, that she did not save the paper. Rather, "[a]t the end when it would get done you'd just toss it." Christie further agreed that when she gave her deposition, she "testified that net profit came from the tax return from the ordinary business income," but she "was confused."

{¶ 13} On re-direct, Christie explained her prior deposition testimony was "confused" because

everybody was, when they were talking about profits, cause there's so many

different label's [sic] of profits and that's what I said.   I never really looked at the tax returns for anything.   I looked at the audited financial statements and that's where I kept getting confused when he was pointing out the tax returns on the profits.   Cause we didn't really call it . . . it was called profit sharing but we didn't call it profits[;] we went by the net income is what it was called.   Is what I associated everything with.   Like I said that was my confusion.

{¶ 14} Christie additionally explained that in 2009, the first year that the company began to realize a profit, she asked appellee and Tom how to determine the amount of appellee's profit-share.   She stated that she "had the financials" and she "even remember[s] him going in there and I was like okay, now this is what we're going off of is the net income?"   Christie testified that "everybody said yes and that's how we took it from there on."   She later clarified that she took "the audited financials," the "binder from the accountant," and she "opened it up" and "said okay, is this what we're going off of."   Christie indicated that both appellee and Tom were present when she asked what figure to use to calculate appellee's profit-share and appellee did not object "to using * * * the financial statements for purposes of determining profit sharing."

{¶ 15} Christie also stated that (1) appellee, Mike, and Tom received health insurance, and the company deducted the cost of the health insurance from its tax returns; (2) appellee had informed her that the cost of his health insurance would be deducted from the amount of his profit share; (3) she approved appellee's request to purchase a motorcycle trailer and title it in appellant's name because appellee was going through a divorce.

{¶ 16} Christie also testified that appellant paid for appellee's golf cart.   She explained that one of appellant's suppliers had indicated that the supplier would credit appellant's account, but Christie stated that the supplier did not credit appellant's account and, thus, she believes that

appellee should either pay for the golf cart or give it to appellant.

{¶ 17} Bill testified that during the initial meeting with appellee, the Enyarts promised to match what appellee had been receiving from his then-employer, plus ten percent of the company's net profits at the end of the year. Bill also understood the employment offer to include health insurance.

{¶ 18} Tom similarly testified that the Enyarts agreed to match appellee's compensation package with his then-employer, plus ten percent of the net profits. Tom explained that appellee's then-employer paid appellee $1,400 per week and provided appellee with a car, cell phone, credit card, and health insurance. Tom additionally stated that appellee's health insurance was part of the compensation package and that the parties did not intend to deduct it from the amount of appellee's profit-share.

{¶ 19} Kevin Ritz testified that he has been appellant's accountant since March 2012. Ritz stated that he would never use the amount of ordinary income reported on line 21 of a company's federal tax return to calculate the amount due an individual under a profit-sharing agreement. Ritz explained that the amount reported on line 21 does not account for deductions, such as depreciation.

{¶ 20} On December 18, 2017, the magistrate issued a decision and determined to ascertain the amount of net profits due appellee by considering the amount shown on line 21 of the company's federal tax return. Although, the magistrate recognized that appellant's expert witness stated that generally accepted accounting principles suggest using audited financial statements for profit sharing agreements, the magistrate observed, however, that when appellee began to work for the company and during his first three years of employment, the company did

not have audited financial statements. Instead, "[t]he only available method of determining 'net profits' for the years 2008-2011 was to rely on the tax returns and ordinary business income." The magistrate thus rejected appellant's suggestion that the parties intended to use audited financial statements to determine the amount of net profits.

{¶ 21} The magistrate next determined that appellee's ten percent share of the company's net profits throughout the course of his employment totaled $730,013.36. The magistrate found that appellee had received $570,008, and that he had a remaining balance due of $203,005.30. The magistrate then considered whether to deduct any other amounts from the balance due to appellee and found that some deductions were in order, including $96,876.26 for various personal purchases appellee had made with company funds. The magistrate did not, however, deduct the cost of appellee's health insurance premiums because "the preponderance of the evidence establishes the [appellee] was offered the same benefit and compensation package as he had at his former employer plus ten percent of net profits. The plaintiff's former employer had paid one hundred percent of his health insurance premiums." The magistrate additionally observed that both Mike and Tom "also took out health insurance policies and their premiums were never charged against their respective profit sharing plans." The magistrate further noted that the company took a tax deduction for the health insurance premiums.

{¶ 22} The magistrate did agree that appellee should bear the cost of the motorcycle trailer and awarded appellee the trailer and charged its cost, $6,300, against his profit-sharing amount.

{¶ 23} The magistrate also determined that appellee "received a golf cart as a 'thank you' from a vendor." The magistrate noted that appellant paid for the golf cart and expected the

vendor to "pay" for the golf cart by offering appellant credits or a discount, but the evidence did not sufficiently establish whether the vendor followed through with its promise. The magistrate nevertheless found that the golf cart was a gift to appellee. The magistrate also recognized that Mike received a golf membership and Tom received a golf cart, and that neither reimbursed the company or otherwise had the costs charged against their share of the net profits.

{¶ 24} Therefore, the magistrate awarded appellee $99,829.04, and dismissed appellant's counterclaim.

{¶ 25} Appellant subsequently filed objections to the magistrate's decision. Appellant objected to the magistrate's profit-sharing calculation and determination that appellee's profit-share over the years totaled $730,013.36. Appellant argued that the magistrate improperly calculated profits by examining the amount of ordinary income reported on appellant's tax returns. Appellant claimed that its expert witness testified that generally accepted accounting practices indicate that net profits should be determined by examining a company's financial statements. The expert further explained that even if net profits were calculated by using the figure contained on the company's tax returns, then standard deductions must also be taken into account. Appellant thus argued that the correct figure is $6,532,402, resulting in total profit-sharing for appellee of $653,240.20.

{¶ 26} Appellant also objected to the magistrate's determination that (1) the health insurance premiums appellant paid for appellee were not chargeable against his profit-sharing; (2) appellee did not need to pay for the golf cart. Appellant claimed that it paid $5,800 for the golf cart and that the magistrate should have offset $5,800 from the amount of appellee's profit-sharing. Appellant thus requested the court to reject the magistrate's decision, to award

appellant $30,246 and release the motorcycle to appellant.

{¶ 27} On March 20, 2018, the trial court overruled appellant's objections to the magistrate's decision.   The court determined that ten percent of the net profits equaled $730,013, that appellee had already received $570,008, thus leaving a balance of $203,005.   From this, the court subtracted the value of other items appellee received, $96,876.26, as well as $6,300 for the motorcycle trailer.   The court also dismissed appellant's counterclaim.   This appeal followed.

{¶ 28} Appellant's four assignments of error all challenge the trial court's factual findings and its ultimate judgment.   Because the same standard of review applies to the four assignments of error, we combine our discussion of them.

{¶ 29} In its first assignment of error, appellant challenges the trial court's decision to calculate the net profits due to appellee by considering appellant's federal tax return.   Appellant argues that its expert witness testified that no profit-sharing agreement would use a company's ordinary income as set forth on line 21 of the company's federal tax returns to determine a company's net profits.   Appellant claims that the trial court should have followed its expert witness's testimony and used the company's financial statements to determine net profits.

{¶ 30} In its second assignment of error, appellant challenges the trial court's finding that appellee's health insurance premiums were part of his compensation package and that the premiums should not be charged against his share of the net profits.

{¶ 31} In its third assignment of error, appellant contests the trial court's decision to award appellee the golf cart and the motorcycle trailer without remuneration.

{¶ 32} In its fourth assignment of error, appellant argues that the trial court's finding that appellee is entitled to $99,829.04 is against the manifest weight of the evidence.

A

{¶ 33} Appellate courts will uphold a trial court's judgment so long as the manifest weight of the evidence supports it. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 63; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus ("Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."). When an appellate court reviews whether a trial court's decision is against the manifest weight of the evidence, the court """weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *.""" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20 (clarifying that the same manifest-weight standard applies in civil and criminal cases), quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A reviewing court may find a trial court's decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983); *accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000). Moreover, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. *Eastley* at ¶ 21. As the *Eastley* court explained:

"'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. * * *

If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'"

*Id.*, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶ 34} Consequently, "we should not reverse a judgment merely because the record contains evidence that could reasonably support a different conclusion." *Bugg v. Fancher*, 4th Dist. Highland No. 06CA12, 2007-Ohio-2019, 2007 WL 1225734, ¶ 9. Instead, as we explained in *Bugg*:

It is the trier of fact's role to determine what evidence is the most credible and convincing. The fact finder is charged with the duty of choosing between two competing versions of events, both of which are plausible and have some factual support. Our role is simply to insure the decision is based upon reason and fact. We do not second guess a decision that has some basis in these two factors, even if we might see matters differently. Rather, we must defer to the trier of fact in that situation.

*Id.* at ¶ 9. As such, when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶ 35} Although an appellate court will ordinarily afford great deference to a trial court's factual findings, the court will not afford any deference to a trial court's application of the law. Instead, the appellate court will independently review whether the trial court properly applied the law. *Powell v. Vanlandingham*, 4th Dist. Washington No. 10CA24, 2011-Ohio-3208, 2011 WL 2571018, ¶ 28, citing *Lovett v. Carlisle*, 179 Ohio App.3d 182, 2008-Ohio-5852, 901 N.E.2d 255

(4th Dist.), ¶ 16; *Pottmeyer v. Douglas*, 4th Dist. Washington No. 10CA7, 2010-Ohio-5293, 2010 WL 4273232, ¶ 21.

**{¶ 36}** We also observe that in general, the decision to adopt, reject, or modify a magistrate's decision lies within the discretion of the trial court and should not be reversed on appeal absent an abuse of discretion. *Anderson v. Anderson*, 4th Dist. No. 16CA3571, 2017-Ohio-2827, 86 N.E.3d 349, 2017 WL 2241610, ¶ 9; *Barlow v. Barlow*, 9th Dist. Wayne No. 08CA0055, 2009-Ohio-3788, ¶ 5. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. *E.g., Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

B

**{¶ 37}** Appellant's assignments of error center upon the terms of the parties' oral employment and profit-sharing contract. "'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'" *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.*, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991). "'In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange.'" *Champion Gym & Fitness, Inc. v. Crotty*,

178 Ohio App.3d 739, 2008-Ohio-5642, 900 N.E.2d 231, ¶ 12 (2d Dist.), quoting *Miller v. Lindsay-Green, Inc.*, 10th Dist. Franklin No. 04AP-848, 2005-Ohio-6366, 2005 WL 3220215, ¶ 63.

{¶ 38} Generally, an oral agreement may be enforceable provided there "is sufficient particularity to form a binding contract." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 15. "Proof of the terms of an oral contract rarely exists with the level of formality found in written contracts. Hence, the terms of an oral contract may be shown from the parties' words, deeds, acts, and silence." *Kodu v. Medarametla*, 1st Dist. Hamilton No. C-160319, 2016-Ohio-8020, 2016 WL 7131035, ¶ 9, citing *Kostelnik* at ¶ 15.

1

{¶ 39} Appellant first challenges the trial court's conclusion that the term "net profits" means the amount of ordinary income shown on line 21 of the company's federal tax return. Instead, appellant claims that the parties' conduct shows that they intended the term to mean the net profits as shown on the company's financial statements.

{¶ 40} After our review, in the case at bar we do not believe that the trial court's finding that "net profits" means the amount of ordinary income shown on line 21 of the company's federal tax return is against the manifest weight of the evidence. Although the parties dispute how the company should calculate "net profits," some evidence supports a finding that appellee's profit-share would be calculated using the amount shown on line 21 of the company's federal tax return. At trial, Christie Enyart, the vice president and individual in charge of determining the amount of appellee's profit-share, testified that she used the company's financial statements to ascertain the net profits. As appellee's counsel noted, however, Christie testified during her

deposition that she referred to the company's tax returns to determine the net profits. At trial, Christie tried to explain that she simply was confused when she gave her deposition testimony. Later during her testimony, she asserted that in 2009, when she initially asked appellee and Tom what figure to use when determining net profits, she showed appellee and Tom the "audited" financial statements. However, the undisputed testimony shows that the company did not have "audited" financial statements until 2012. Thus, the court could have found Christie's testimony that she relied upon the company's financial statements confused and unworthy of belief. The court could have instead determined that Christie's deposition testimony established that she used the company's tax returns to calculate net profits and changed her story to defend against appellee's claim for unpaid sums. *Eaton v. Blackburn, dba Gallipolis Business College*, 4th Dist. Gallia No. 78 CA 7, 1981 WL 5905 (Jan. 23, 1981), *1 (noting that when parties present conflicting evidence regarding meaning of "net profits," "the trier of fact must determine the credibility of the witnesses and resolve the conflict"). Consequently, we do not believe that the trial court's decision to use the company's tax returns to ascertain the amount of net profits due appellee is against the manifest weight of the evidence.

{¶ 41} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

2

{¶ 42} In its second assignment of error, appellant challenges the trial court's conclusion that appellee's health insurance premiums should not be charged against his ten percent of the net profits. Appellant claims that the evidence shows that the parties did not intend to include health insurance coverage in appellee's compensation package.

{¶ 43} Once again, the parties presented conflicting testimony regarding appellee's health insurance premiums and whether appellant's offer of employment contemplated paying for appellee's health insurance. Everyone present at the meeting when appellant offered appellee a job, except Mike, testified that appellee's compensation package included health insurance. Tom testified that appellant agreed to match the compensation package appellee had been receiving from his then-employer and that the compensation package included health insurance. Bill likewise testified that appellee's employment with appellant contemplated health insurance coverage. Appellee additionally stated that he believed appellant would provide health insurance coverage. In light of this evidence, we will not second-guess the trial court's finding that appellant agreed to pay appellee's health insurance premiums.

{¶ 44} We note, however, that appellant offers several other reasons to show that the court's finding that appellee's compensation package included health insurance is against the manifest weight of the evidence. Appellant asserts that the following evidence illustrates that health insurance was not part of appellee's compensation package: (1) appellee did not obtain an insurance policy until approximately a year and one-half after he started working for appellant; (2) no other employees of the company received company-provided health insurance; and (3) Mike and Tom obtained health insurance at the same time as appellee and they paid for their health insurance from the profits.

{¶ 45} We do not believe that the foregoing evidence shows that the court's finding is against the manifest weight of the evidence. Three of the four people present at the meeting during which appellant offered appellee a job testified that the job offer included health

insurance.   The trial court could have chosen to believe those three individuals' testimony and could have reasonably discounted any subsequent evidence that appellant believes negates a finding that appellee's compensation package included health insurance.

**{¶ 46}** Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

3

**{¶ 47}** In its third assignment of error, appellant asserts that the trial court erred by failing to either (1) require appellee to reimburse appellant for the cost of the motorcycle trailer or (2) award the motorcycle trailer to appellant.   Appellant also argues that the trial court erred by failing to require appellee to reimburse appellant for the golf cart.

**{¶ 48}** First, with respect to the motorcycle trailer, we observe that the trial court did, in fact, find that appellee should be responsible for the cost of the motorcycle trailer.   Additionally, the court charged the cost of the motorcycle trailer against appellee's share of the outstanding net profits.   We therefore reject appellant's argument that the court failed to require appellee to bear the cost of the motorcycle trailer.

**{¶ 49}** Second, concerning the golf cart appellant asserts that the evidence shows that one of appellant's suppliers had offered to pay for appellee's golf cart in the form of a credit to appellant's account.   Appellant contends that it purchased appellee's golf cart, but it did not receive the promised credit.   Appellant thus argues that because it paid for the golf cart, appellee must reimburse appellant for its cost.

**{¶ 50}** The trial court, however, agreed with the magistrate's determination that the golf cart was a gift.   The court noted that Tom also received a golf cart and that Mike received a golf

membership–both of which appellant paid for–and that neither Tom nor Mike reimbursed appellant for the costs. The court thus could have reasonably determined that the company likewise did not expect appellee to reimburse it for the cost of his golf cart. We therefore do not believe that the court's finding that the golf cart represents a gift to appellee is against the manifest weight of the evidence.

{¶ 51} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

4

{¶ 52} In its fourth assignment of error, appellant challenges the trial court's judgment to award appellee $99,829.04. Appellant contends that if the court used the net profits as shown on the company's financial statements and deducted the cost of golf cart, the motorcycle trailer, and health insurance, then appellee owes appellant $29,711.06.

{¶ 53} We, however, believe that our disposition of appellant's first three assignments of error also disposes of its fourth assignment of error. In our discussion of appellant's first three assignments of error, we rejected the arguments that the court's determinations regarding the net profits, the golf cart, the motorcycle trailer, and health insurance were against the manifest weight of the evidence. We therefore disagree with appellant that appellee owes it $29,711.06.

{¶ 54} Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J. & McFarland, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.