[Cite as *State v. Tolbert*, 2019-Ohio-2557.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170711 |
| | | TRIAL NO. B-1703355 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| LUTHER TOLBERT, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: June 26, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela Stagnaro*, for Defendant-Appellant.

**Mock, Presiding Judge.**

{¶1}     While defendant-appellant Luther Tolbert was properly convicted of aggravated burglary, we conclude that the trial court improperly ordered him to stay away from the victims' family and that it failed to properly document the merger of the second count of the indictment with the first.  For that reason, we affirm the judgment of the trial court in part, vacate it in part, and remand the cause for further proceedings.

### An Argument Escalates

{¶2}     Tolbert arrived at the home of Beverly and Wesley Ward on June 5, 2017.  Tolbert had a child with one of the Wards' granddaughters, Myshel Ward, and he had driven to their residence to pick up his child.  Because of previous incidents involving Tolbert and the Wards, Tolbert had been told repeatedly that he was not welcome in the home.  When Tolbert arrived, Myshel's aunt, Nicole Ward ("Nicole"), was bringing in groceries.  According to Nicole's testimony, she spoke with Tolbert briefly and told him that she would go get Myshel.  When Nicole told Tolbert that he had to come back later because Myshel was sleeping, Tolbert became angry and stormed back to his car complaining that "she gon [sic] make me start."

{¶3}     Nicole continued to bring in groceries, and Tolbert entered the home while Nicole was in the kitchen.  Nicole testified that he was searching the house asking where Myshel was.  Nicole confronted Tolbert and told him he had to leave, but Tolbert was acting "sporadically" and would not listen.  Tolbert eventually made his way to the back bedroom where Myshel was sleeping and began to hit her, according to Nicole.  Nicole testified that she heard one of the children yelling for Beverly and Wesley Ward, telling them that Tolbert was hitting Myshel and that he had a gun.  An objection to that testimony was sustained.  Nicole testified that she did not see Tolbert with a gun.

2

{¶4}     Beverly Ward testified that she awoke when her great-granddaughter pounded on the wall and yelled that Tolbert was in the home, hitting Myshel, and that he had a gun.  Mrs. Ward testified that she confronted Tolbert and told him to leave.  She then said that he "started to walk out the door, he turned around and came back in the door and he pulled the gun on me."  According to Mrs. Ward, it was a small, silver handgun and he pointed it in her face.  The confrontation occurred on the front porch of the home, which the Wards had converted into a computer room and living area in the 1990s.  The room had been decorated with bookcases, seating, and computer equipment, and the Wards considered it part of their home, even though the door to the computer room from the outside did not lock.  Mr. Ward, who had been standing behind her, then pulled Mrs. Ward into the living room, and Tolbert left.

{¶5}     Wesley Ward testified that after the couple had been awakened by their great-grandchildren, he confronted Tolbert and asked him to leave.  But because Tolbert would not listen to him, he left Mrs. Ward to address him and Mr. Ward went onto the front porch.  He testified that Mrs. Ward was yelling at Tolbert that he needed to have someone else come pick up the child and that he was not allowed in the home.  Mr. Ward testified that Tolbert left through the porch area as Mrs. Ward continued to yell at him.  Tolbert then came back on the porch, yelling "say it one more time. Say it one more time."   Mr. Ward said that, at that point, Tolbert produced a small, silver handgun and pointed it in his wife's face.  Mr. Ward then pulled Mrs. Ward into the living room, and Tolbert left.

{¶6}     While Tolbert was still at the residence, one of the residents called 911.  The recording of the 911 call was played during the trial.

{¶7}     Tolbert's version of events differed significantly from the testimony of the Ward family.  Tolbert testified that he was at the home to pick up his son.  He

3

said that when he arrived he spoke with Nicole about picking up the child. He then followed her to the house. When he reached the door, he picked up one of the children and discovered that the child had a dirty diaper. He said that he offered to change the child, and entered the home with Nicole. He then said that he went back to find Myshel. When he could not get her to wake up, he started to move toward that door. It was at that time, according to his testimony, that he was confronted by Mr. and Mrs. Ward. He left the home and approached his vehicle. When he reached the vehicle, he said that he was threatened by a member of the Ward family. He said that he then retrieved a firearm from the vehicle, but said that he never brandished it or pointed it at anyone. He testified that he then got into his vehicle and left.

{¶8} Sergeant Eric Catron from the Springfield Township Police Department also testified at trial. He said that he arrived at the scene after Tolbert had left but spoke to him on the phone when Tolbert called Myshel. During the course of his investigation, Sergeant Catron also accessed the recordings of phone calls that Tolbert made while he was being held at the Hamilton County Justice Center. Sergeant Catron testified that only the first few calls were pertinent to his investigation. The calls were between Tolbert and Myshel. Sergeant Catron had the calls copied to a disk and transcribed. Both the recordings and transcriptions were admitted into evidence and reviewed by the trial court during the course of the trial. During his testimony, Sergeant Catron summarized the content of the calls by stating that "he admits in various different ways to committing the offense several times. He also denies it, and then he gives several different reasons why he did it."

{¶9} Tolbert was indicted on two counts of aggravated burglary. The first count alleged a violation of R.C. 2911.11(A)(2) and carried one- and three-year gun specifications. The second count alleged a violation of R.C. 2911.11(A)(1). Tolbert waived his right to a jury trial and the matter was tried to the court. At the

4

conclusion of the trial, the trial court found him guilty of both counts and both specifications. The trial court sentenced him to three years in prison on count one, and three years on the second gun specification. During the sentencing hearing, the trial court told Tolbert that the second count would be merged with the first count, but that decision was not memorialized in the judgment entry. The trial court also ordered Tolbert to have no contact with the Ward family. In four assignments of error, Tolbert now appeals.

### The Admission of Evidence

{¶10} In his first assignment of error, Tolbert claims that the trial court erred when it admitted a number of statements into evidence. He first claims that the trial court improperly admitted the evidence of his jail calls as the calls had not been authenticated, contained hearsay, and violated his right of confrontation as announced in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). He also argues that the statements made by the Wards' great-granddaughter that he was hitting Myshel and that he had a gun were improperly admitted.

{¶11} Tolbert concedes that he did not object to the evidence that he now claims was improperly admitted and considered. The failure to object to the admission of evidence at trial waives all but plain error on appeal. *See* Crim.R. 30(A); *State v. Harris*, 2017-Ohio-5594, 92 N.E.3d 1283, ¶ 15 (1st Dist.). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. To prevail on a claim that the trial court committed plain error, an appellant must demonstrate that an error constitutes an obvious defect in the trial proceedings and demonstrate that the error affected the outcome of the trial. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 23.

{¶12} Beginning first with the admission of the jail calls, the record reflects that defense counsel stipulated to the admission of the calls in their entirety. During the trial, the following exchange took place:

[Defense Counsel]: And did we want to address on the record while we're up here, I know that there's some audio recordings of some calls from the jail.

I have spoken to my client; I believe they've been transcribed. I believe the transcription pretty accurately reflects what's in the audio calls, and I don't have a problem [stipulating] to those calls.

It's my understanding that Your Honor may have listened to them and looked at a transcript, so we don't have to play them in open court.

[The Court]: Right. I did both.

[Defense Counsel]: And I've spoken to my client about the fact that I don't have a problem allowing that to happen as opposed to having them done in open court. They're a little hard to hear.

Thus, counsel was aware not only aware of the nature of the evidence, but also that the trial court had already read the transcript and listened to the calls. If counsel had any objection to all or part of the recordings, this was the time to raise it. But the record makes clear, at that point, that the parties were in agreement that the evidence would be admitted. And prior to the admission of the calls, counsel for Tolbert had discussed the new evidence with the trial court, saying

There is some new discovery that I did get this morning. It's paraphrased by the officer, but I'd like to - - it's apparently jailhouse calls.

I think some of it is helpful. It delves into my client's concept of what happened that day, and the prosecutor probably feel's it's helpful, but I'd like to listen to the actual call.

Counsel did not object when the recordings and transcripts were offered for admission by the state.

{¶13} Defense counsel made the decision not to object to the evidence, believing that portions of it were helpful to Tolbert's case. Nothing in the record contradicts this conclusion. Therefore, it was not plain error to admit the transcripts and recordings into evidence.

{¶14} Tolbert's next argument presents a different question. Tolbert claims that the trial court erred when it allowed the testimony of Mr. and Mrs. Ward that one of their great-grandchildren had shouted that Tolbert was hitting Myshel and that he had a gun. But Tolbert has failed to establish that the trial court relied upon the statement when rendering its decision. A judge in a bench trial is presumed not to have considered improper evidence in reaching a verdict. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 39. And this presumption stands "unless it affirmatively appears to the contrary." *Id.*, quoting *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). As the Sixth Appellate District has noted, absent an affirmative showing in the record rebutting the presumption that the trial court considered only relevant, material, and competent evidence in arriving at its judgment, a ruling on admissibility of evidence in a bench trial presents no issue reviewable as plain error. *State v. Williams*, 2013-Ohio-726, 987 N.E.2d 322, ¶ 31 (6th Dist.), citing *In re B.P.K.*, 10th Dist. Franklin No. 12AP-343, 2012-Ohio-6166, ¶ 16.

{¶15} There is nothing that demonstrates that the trial court considered any improper evidence. In fact, the record demonstrates to the contrary. Testimony

regarding what the great-grandchild may have shouted through the Wards' closed bedroom door was first introduced in the testimony of Nicole Ward. When she said that the great-grandchildren had yelled that Tolbert was hitting Myshel and that he had a gun, defense counsel objected, and the trial court sustained the objection. And at no point during either the trial or sentencing did the trial court reference the statement, Tolbert hitting Myshel, or Tolbert threatening Myshel with the gun.

{¶16} Tolbert claims that this was the only evidence that he had a weapon in the house; but that argument is premised on the assertion that that porch area was not part of the house for the purposes of the aggravated-burglary statute. R.C. 2911.11(A)(2) states that

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

An "occupied structure" is defined as

> *any house*, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, *or any portion thereof*, * * * [that] * * * is *maintained as a permanent or temporary dwelling*, even though it is temporarily unoccupied and whether or not any person is actually present.

(Emphasis added.) R.C. 2909.01(C)(1).

{¶17}  Tolbert argues that the porch "was a sitting area outside the house that just happened to be enclosed." But, as the state points out, the pictures of the area are such that the factfinder could conclude that the area was part of the residence. The area had been remodeled in the 1990s, it was attached to the main portion of the home, it had been decorated and furnished, and the residents spent time in the area during the warmer months, which would include the month of June when this offense occurred. There was ample evidence that the front porch area was part of the residence; i.e., a portion of a house that is maintained as a permanent dwelling.

{¶18}  Since there was evidence that Tolbert was inside the "residence" with the handgun other than the testimony about what the great-grandchildren had said, Tolbert has pointed to nothing in the record to indicate that the trial court considered the statement when making its determination of his guilt. We overrule his first assignment of error.

### Ineffective Assistance of Counsel

{¶19}  In his second assignment of error, Tolbert claims that his trial counsel was ineffective and that, as a result, he was denied a fair trial. To prevail on an ineffective-assistance-of-counsel claim, Tolbert must show that trial counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to demonstrate prejudice, Tolbert must establish that, but for counsel's errors, there is a reasonable probability that the result of trial would have been different. *State v. Burke*, 97 Ohio St.3d 55, 2002-Ohio-5310, 776 N.E.2d 79, ¶ 6. The failure to make an adequate showing on either prong is fatal to an ineffective-assistance-of-counsel claim. *See Strickland* at 697.

{¶20}   First, Tolbert claims that counsel was ineffective for failing to object to the testimony presented in the first assignment of error.  But, as set forth above, trial counsel appears to have made the decision to allow the recorded phone calls into evidence as part of his trial strategy.  Refraining from objecting to otherwise objectionable evidence may, depending upon the circumstances, be sound trial strategy.  *See State v. Proffitt*, 12th Dist. Butler No. CA2016-07-134, 2017-Ohio-1236, ¶ 32.  As for the failure to object to the claimed hearsay statements of the great-grandchild, Tolbert cannot show that the trial court considered the statements and, as a result, cannot demonstrate that he has suffered any prejudice as a result of the testimony.

{¶21}   Tolbert next claims that trial counsel was ineffective for allowing Sergeant Catron to summarize the contents of the phone calls.   He argues that the summary "was not accurate"; but does not explain how it was inaccurate.  Even if this was correct—a fact that Tolbert has failed to establish—the record clearly demonstrates that the trial court listened to the recordings and reviewed the transcript on its own.  Tolbert was not prejudiced by any inaccuracy in the summary done by Sergeant Catron.

{¶22}   Tolbert also argues that counsel was ineffective for failing to object to the imposition of a no-contact order as a portion of his sentence.  Since we will address that issue in Tolbert's final assignment of error, we need not address it here. *See* App.R. 12(A)(1)(c).  We overrule Tolbert's second assignment of error.

### Sufficiency/Weight of Evidence

{¶23}   In his third assignment of error, Tolbert claims that his conviction was based upon insufficient evidence and was contrary to the manifest weight of the evidence.  In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of

fact could have found all the essential elements of the crime proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When considering a challenge to the weight of the evidence, the court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus.

{¶24} In order for the trial court to find Tolbert guilty of aggravated burglary, in violation of R.C. 2911.11(A)(2), the state had to prove that Tolbert by force, stealth, or deception, trespassed in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person was present, with purpose to commit in the structure any criminal offense, if he had a deadly weapon on or about his person or under his control. Tolbert's argument hinges upon finding one version of the events more credible than another version. Therefore, the main thrust of his argument here is the manifest weight—rather than the sufficiency—of the evidence. We will address each of his arguments in turn.

{¶25} Tolbert first claims that he did not enter the home by means of "force, stealth, or deception." He argues that he simply followed Nicole Ward into the home. It is unclear how precisely Tolbert entered the home. He followed Nicole Ward, but it is unclear if he opened a closed door or if he walked through the open door. Either way, the statutory element had been met in this case.

{¶26} It has long been established in Ohio that the force element of an aggravated-burglary charge can be accomplished through the opening of a closed but

11

unlocked door. *See State v. Lane*, 50 Ohio App.2d 41, 361 N.E.2d 535 (10th Dist.1976). Therefore, had Tolbert opened the closed door, this action would have been sufficient to meet the definition of force.

{¶27} Alternately, if he walked in the open door, the record supports the conclusion that he entered by stealth. Nicole Ward testified that Tolbert entered the home while she was in the kitchen putting away groceries. She said:

A. Then I went back in and continued to put the groceries up, because I had gone grocery shopping just before I had came back home.

And like seconds later, all of a sudden he's coming in the home, he's talking about where is Myshel at? Where is Myshel?

Q. Now where in the home is he at that point?

A. He's in our kitchen at this time, and I'm putting groceries away, like I never once told you to come in or anything.

From this evidence, the trial court could properly conclude that the element was met.

{¶28} Tolbert next argues that the state failed to prove that he trespassed with the intent to commit a criminal offense, claiming that he entered the property only with the intent to pick up his son. But the intent to commit a criminal offense need not be formed prior to entry of the premises, but may be formed any time during the trespass. *See State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 33. Once inside the home, he brandished a weapon and threatened Mrs. Ward. While he may not have had this intention when he entered the premises, the record supports the conclusion that once Myshel told him to come back later, his intent changed.

{¶29} Tolbert next argues that he did not trespass in an occupied structure, claiming that he was only on the front porch when he had the handgun. He argues

that "[i]t was a sitting area outside the house that just happened to be enclosed." But, as we have previously discussed, the record supports the conclusion that the porch was part of the residence for the purposes of R.C. 2911.11(A)(2).

{¶30} Finally, Tolbert argues that there was no evidence that that he had inflicted or attempted to inflict physical harm on Mrs. Ward. But, as we determine in the fourth assignment of error, the trial court merged the physical-harm aggravated-burglary count during the sentencing hearing. Therefore, Tolbert was not harmed by any error in this regard. *See State v. Coleman*, 2016-Ohio-7335, 72 N.E.3d 1086, ¶ 66 (6th Dist.) (error involving evidence relating to merged counts is harmless when the evidence goes only to the merged counts).

{¶31} Tolbert also argues that the trial court improperly convicted him of the three-year gun specification "because he did not display, brandish, indicate possession of, or use the gun to facilitate the offense." This is only true if you believe his version of events and discredit the version of events testified to by Mr. and Mrs. Ward. We overrule Tolbert's third assignment of error.

### Sentencing

{¶32} In his final assignment of error, Tolbert first claims that the trial court improperly issued a no-contact order against him. A no-contact order is a community-control sanction. *State v. Anderson*, 143 Ohio St.3d 173, 2015-Ohio-2089, 35 N.E.3d 173, ¶ 17. "[W]hen a prison term and community control are possible sentences for a particular felony offense, absent an express exception, the court must impose either a prison term or a community-control sanction or sanctions." *Id.* at ¶ 31. Therefore, the trial court did not have the authority to impose both a prison sentence and a no-contact order. *See id.* at ¶ 32. The state concedes error in this regard.

{¶33}   Tolbert also argues that the trial court erred when it failed to merge count two with count one.  A review of the record indicates that the trial court did order count two to be merged with count one, but the entry incorrectly reflects that the trial court had ordered the sentences to be run concurrently.  The state also concedes error in this regard.  We therefore sustain Tolbert's fourth assignment of error.

## Conclusion

{¶34}   Having considered each of Tolbert's assignments of error, we affirm the judgment of the trial court in part, vacate the no-contact order, and remand the matter to the trial court with instructions to correct its entry to reflect that count two of the indictment was merged with count one.  When correcting the entry, the trial court should also remove reference to the no-contact order that we have vacated herein.

Judgment affirmed in part, vacated in part, and cause remanded.

**ZAYAS** and **BERGERON, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.