[Cite as *State v. Travis*, 2019-Ohio-4407.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO.  1-18-39

    v.

COREY L. TRAVIS,                     O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2017 0077

**Judgment Affirmed**

**Date of Decision:   October 28, 2019**

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Corey Travis ("Travis"), brings this appeal from the June 27, 2018, judgment of the Allen County Common Pleas Court sentencing him to an aggregate 13-year prison term after a jury convicted him of Felonious Assault in violation of R.C. 2903.11(A)(1), a second degree felony, and Endangering Children in violation of R.C. 2919.22(B)(1), a second degree felony. On appeal, Travis argues that he was deprived of a fair trial when the trial court appointed counsel for Travis's wife Marissa, a defense witness, and she thereafter invoked her Fifth Amendment right against self-incrimination and did not testify. In addition, Travis argues that the trial court further erred by refusing to admit a transcript of Marissa's testimony from a prior suppression hearing into evidence once she invoked her Fifth Amendment right to remain silent and became unavailable as a witness at trial.

*Background*

{¶2} On March 16, 2017, Travis was indicted for Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree (Count 1), and Endangering Children in violation of R.C. 2919.22(B)(1), a felony of the second degree (Count 2). It was alleged that Travis abused his one-month old son R.T. and caused him serious physical harm on or about February 12, 2017, to February 13, 2017. Travis was also indicted for Felonious Assault in violation of R.C.

2903.11(A)(1), a felony of the second degree (Count 3), and Endangering Children in violation of R.C. 2919.22(B)(1), a felony of the second degree (Count 4). In these counts it was alleged that Travis abused R.T. causing him serious physical harm, specifically an arm fracture, between the dates of January 25, 2017, and February 13, 2017. Travis pled not guilty to the charges.[1]

{¶3} Travis's case proceeded to a jury trial, which was held June 4, 2018, through June 8, 2018. The testimony indicated that Marissa Travis brought R.T. to the emergency room at Lima Memorial Hospital on the evening of February 13, 2017.[2] At the time, R.T. was 32 days old. Marissa informed hospital staff that R.T. had blood in his diaper with urination, pain when his head was stroked, and a popping sound in his chest with deep breaths. An emergency room physician picked up R.T. and felt his back "crunch under [her] hands," which she testified was completely abnormal. (Tr. at 117). R.T. also had bruises on his ears, scalp, back,[3] and eyes, and the emergency room physician indicated that there was something abnormal with his head shape. He was also small for his age.

{¶4} Medical personnel quickly concluded that R.T. had multiple serious injuries that appeared non-accidental in nature. Based on this, medical personnel

---

[1] Travis also originally pled not guilty by reason of insanity, but after an evaluation and hearing, it was determined that Travis was legally sane at the time of the offense.

[2] Travis was at work when Marissa took R.T. to the emergency room.

[3] Travis essentially admitted that he had caused the back bruises, which were older than the other injuries. He stated that he had burped R.T. too hard with his tungsten ring on his finger, which caused the bruises.

reported the matter to law enforcement and child protective services ("CPS"). Imaging tests revealed that R.T. had, *inter alia*, skull and rib fractures.

{¶5} At the hospital on that same night, two detectives and a member of CPS met with Marissa alone, and then Travis alone,[4] interviewing them about who had access to the child in recent days as it was suspected that R.T.'s acute injuries had occurred within 24-48 hours. It was learned that Marissa and Travis lived with Marissa's two brothers, one who had muscular dystrophy and did not handle R.T. and the other who worked a significant amount of hours and also did not handle R.T. During their individual interviews, Marissa and Travis both indicated that they were the primary caretakers of R.T. and that they did not know how R.T. had been injured.

{¶6} Law enforcement and CPS then interviewed Marissa and Travis together at the hospital while R.T. was being tended to by hospital staff. At one point a brief break was taken from the collective interview when one of the law enforcement officers was informed that R.T. was going to be flown via helicopter to a hospital in Toledo due to the severity of the injuries. At that time, Travis indicated that he "might" have been the cause of R.T.'s injuries.

{¶7} Law enforcement and CPS then recorded the remainder of the interview with Marissa and Travis at the hospital and it was played at trial. During that

---

[4] Travis left work and went to the hospital upon being informed of the severity of R.T.'s injuries.

-4-

interview Travis stated that he thought he injured R.T. by accident while trying to keep him quiet. Travis made physical gestures with his hands indicating squeezing and shaking R.T. The CPS worker testified that Travis demonstrated grabbing and shaking R.T. two or three times, but Travis said he did not do it very hard. Travis described his actions as "quick easy jerks." (State's Ex. 32). Travis stated that R.T. did not act any different so Travis did not think there was anything wrong.

{¶8} After being flown to the hospital in Toledo, R.T. remained in intensive care for a week. It was determined that R.T. had several fractures to his skull, several ribs that were fractured, a fractured leg, and bleeding in the brain. It was also discovered that R.T.'s left arm had previously been fractured but had begun to heal, suggesting that it had occurred sometime in the weeks prior to the most recent injuries.

{¶9} Medical testimony revealed that the injuries were not naturally occurring as R.T. was not yet ambulatory, and that the injuries were indicative of child abuse. In fact, a pediatric orthopedic surgeon testified that it was "clearly an abuse case," that some of the injuries resulted from pulling or twisting, and that rib fractures commonly resulted from squeezing or a direct blow from the back. (Tr. at 659, 666, 669). The orthopedic surgeon testified that the damage was far outside how a person would handle a child. A different pediatric emergency medicine doctor who examined R.T. also testified that the injuries in this case were not

naturally occurring, that they were consistent with child abuse, and that the injuries were *not* a result of a difficult birth as the defense was suggesting. (Tr. at 388, 424).

{¶10} On February 16, 2017, a few days after R.T. was initially brought to the emergency room, Travis was interviewed again by a detective, this time alone at the police station. Travis again made statements that he thought he might have accidentally hurt R.T., though he claimed he did not intend to do so. The detective pressed Travis, stating that the injuries were not consistent with light shakes as Travis had claimed in the prior interview.

{¶11} Travis then stated that he had small "spurts" of frustration, and that he was aware that there were times that he was too rough with R.T.—instances that "got out of hand." (State's Ex. 33). He stated there were one or two small "spurts" of action that he could not control, and that he remembered he was rougher than he thought he should have been with R.T. while putting him down and changing him. He also made a shaking motion, stating he became frustrated when he did not know how to help the crying child. In addition, he demonstrated solid slaps onto R.T.'s back. He stated it was hard to gauge how violent his actions were because R.T. was just a baby. When asked about whether Marissa could have caused any of the injuries, Travis stated that he had never seen Marissa be violent with R.T. This interview was recorded and presented at trial.[5]

---

[5] In the same time frame, Travis spoke to the CPS worker and requested to take parenting classes, stating he knew he had a "frustration" issue.

{¶12} Later, after Travis had been charged in this matter, Travis wrote a letter to Marissa wherein he claimed responsibility for injuring R.T.; however, he said he had recalled injuring R.T. from a vivid dream he had. The letter was presented at trial and read, in part, as follows.

> **There is no easy way to say this so I'm going to just say it. I did do this to [R.T.]. It wasn't intentional by any means of the word. All the stress from everything and work and jobs and just everything I lost it and it was on the wrong person. I don't know what happened but I couldn't control it. I tried I really did but the mix between everything just took over and I went crazy. I really tried to stop it before it happened and I just couldn't. And it's tearing me apart because I do love him and you with all my heart. I fucked up everything and it's killing me inside. Please know babe I'd do anything to take this all back and I really didn't mean to. I only know all this because I had a dream about it and it was so vivid and so real that I don't think there's anyway [sic] it couldn't be real. I never want to have that dream again but this is something I have to deal with the rest of my life. I really couldn't blame them for putting me in prison after that dream. Please just know I do love you both more than anything in this world and I'd NEVER do anything to hurt either of you intentionally. I didn't know at the time that it happened that I did it when I told them I did but I won't lie to you about it babe I refuse to. If nothing else I had to tell you because we're a team and I don't want to keep anything from you.**

(State's Ex. 35).

{¶13} In addition to the letter, the State presented evidence that Travis made over 1100 phone calls from jail, many to Marissa who initially minimized the severity of Travis's involvement in R.T.'s injuries; however, Marissa eventually stopped taking Travis's calls. After she stopped taking his calls, Travis began

Case No. 1-18-39

making calls to his mother to discuss his case. At that time Travis told his mother that he believed Marissa caused the injuries to R.T., and that he was going to give his attorney the "greenlight to throw whoever he had to under the bus in order to get him found not guilty." (Tr. at 780). The content of the phone calls was generally discussed, but only one actual call was entered into evidence, wherein Travis spoke with Marissa about the letter he sent her regarding the "dream."

{¶14} After the State rested its case Travis testified in his own defense and denied injuring R.T. He also stated that he felt that threats were made to him in the interviews with law enforcement and CPS, specifically that if he did not cooperate in the investigation R.T. would be taken away by CPS.[6] In addition, Travis felt he was threatened by law enforcement and CPS that if R.T. were to die both Travis *and* Marissa could be charged with murder. Travis claimed that when he told the detectives and the CPS worker that he could have harmed R.T. it was not the truth, and that his letter to Marissa was only relating a dream he had. He indicated he thought law enforcement would work with him to keep the family intact if he falsely admitted to accidentally harming R.T.

{¶15} Travis also testified that some of the pictures from shortly after birth showed what he thought appeared to be injuries to R.T. There was some testimony

---

[6] Travis attempted to suppress the statements he made to law enforcement in this matter, and a suppression hearing was held. The trial court ultimately determined that Travis was not in custody for either of the interviews, and thus essentially no coercion was present.

that at one point R.T. received a diagnosis of "Erb's Palsy," which can include, *inter alia*, clavicle fractures. However, the medical testimony was consistent that Erb's Palsy was not the cause of these injuries. Nevertheless, Travis maintained that he felt some or all of the issues with R.T. were caused from birth, and to the extent they were not, he did not know how R.T. was injured.

{¶16} Through cross-examination of various witnesses, Travis's attorney insinuated that the State did not do enough to investigate Marissa or her brothers as potential culprits. In fact, Travis's attorney pointed out that neither law enforcement nor CPS spoke to Marissa's brother with muscular dystrophy.

{¶17} In his case-in-chief, Travis also attempted to call Marissa to testify, but before she testified the State requested that she have an attorney appointed for her due to the potential possibility of incriminating herself through her testimony. The trial court appointed counsel for Marissa. After speaking with counsel, Marissa indicated that she would only answer basic questions about her identity but would invoke her Fifth Amendment right to remain silent regarding anything else. After Marissa invoked the Fifth Amendment, and the trial court determined Marissa had a legitimate basis to do so, Travis attempted to introduce a transcript of Marissa's testimony from an earlier suppression hearing that focused on whether Travis's statements made to law enforcement were voluntary, but that request was denied.

{¶18} Travis rested his case. Afterward, the State called one rebuttal witness, and then the matter was submitted to the jury. The jury found Travis guilty of all four counts against him.

{¶19} On June 19, 2018, the matter proceeded to sentencing. The trial court found that Felonious Assault in Count 1 merged with Endangering Children in Count 2, and that the Felonious Assault in Count 3 merged with the Endangering Children in Count 4. The State elected to proceed to sentencing on Count 1, Felonious Assault and Count 4, Endangering Children. Travis was ordered to serve 7 years in prison for the Felonious Assault conviction, and 6 years in prison for the Endangering Children conviction. The sentences were ordered to be served consecutively, for an aggregate 13-year prison term. A judgment entry memorializing the sentence was filed June 27, 2018. It is from this judgment that Travis appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The defendant was deprived of a fair trial when the court, at the sole suggestion of the prosecutor, appointed an attorney for a defense witness, without her requesting the same, and then have the witness invoke the fifth amendment and not testify for the defendant.**

**Assignment of Error No. 2**
**Whether the Trial Court deprived the Defendant of a fair trial by allowing one of his witnesses to assert a blanket right against self-incrimination and thereby not allow the Defendant to have the benefits of her testimony.**

*First Assignment of Error*

**{¶20}** In Travis's first assignment of error, he argues that the trial court erred by appointing counsel for Marissa without her requesting one, and that the trial court erred by allowing Marissa to thereafter make a blanket invocation of her Fifth Amendment right to remain silent.

Relevant Authority

**{¶21}** "The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution declare that no person shall be compelled in any criminal case to be a witness against himself." *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, ¶ 30. "[T]he privilege against self-incrimination is accorded liberal construction in favor of the right it was intended to secure." *Id.* at ¶ 31. It applies with equal force to "witnesses who would incriminate themselves by giving responses to questions posed to them." *Id.*

**{¶22}** The right to invoke the Fifth Amendment is not absolute. *Id.* at ¶ 43. The bare assertion of the Fifth Amendment privilege does not provide automatic justification for a witness to refuse to testify. *Id.* at ¶¶ 45-46. Rather, the witness claiming the privilege must assert a basis for asserting the privilege. *Id.* at ¶ 44. Such a burden is "not an onerous one." *Id.* At minimum, "the proponent must establish that he or she is faced with some authentic, objectively reasonable danger of incrimination." *Id.*, citing *Hoffman v. United States*, 341 U.S. 479, 486-87, 71

-11-

S.Ct. 814 (1951). The danger of incrimination exists where a witness's answers "may reasonably have a tendency either to incriminate the witness or to furnish proof of an element or link in the chain of evidence necessary to convict the witness of a crime." *Arnold* at ¶ 45.

{¶23} Generally, a witness must assert the Fifth Amendment privilege against self-incrimination on a question-by-question basis. *Vega v. Tivurcio*, 10th Dist. Franklin No. 14AP-327, 2014-Ohio-4588, ¶ 12, *appeal not accepted* 142 Ohio St.3d 1422, 2015-Ohio-1353; *Arnold* at ¶ 44, citing *In re Morganroth*, 718 F.2d 161 (6th Cir.1983). However, "[a] trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination." *State v. Kirk*, 72 Ohio St.3d 564 (1995), paragraph one of the syllabus.

{¶24} Ultimately, it is the duty of the trial court to inquire into the witness's basis for asserting the privilege and to determine whether the witness's silence is justified. *Arnold* at ¶ 46. The Court in *Arnold* cautioned that in making such a determination, the trial court must "tread lightly" in order to protect the witness from surrendering the protection of the privilege in the process. *Id.* at ¶ 47. *Arnold* recognizes that a trial court should require a witness to answer questions only if "

'it clearly appears to the court that [the proponent of the privilege] is mistaken.' "
*Id*. at ¶ 45, quoting *Hoffman* at 486.

**{¶25}** Furthermore, if a trial court commits error in failing to sufficiently delve into a witness's purported fear of incrimination, an appellate court must still affirm the trial court's judgment if the state proves beyond a reasonable doubt that the trial court's inquiry was harmless. *Arnold* at ¶ 49. In criminal cases, the harmless error standard requires that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). Generally, for an error to affect substantial rights, the defendant must have suffered prejudice. *Id*. at ¶ 50; *State v. Smith*, 10th Dist. Franklin No. 16AP-772, 2017-Ohio-7740, ¶ 22, *appeal not allowed*, 152 Ohio St.3d 1423, 2018-Ohio-923.

Analysis

**{¶26}** In this case, Marissa was under subpoena by both the State and the defense. The State did not call Marissa in its case-in-chief and withdrew her subpoena. Travis then indicated to the trial court that he intended to call Marissa as his first witness in his defense. At that time, a discussion ensued between the parties outside the presence of the jury.

> **[PROSECUTOR]: It's my understanding in the phone calls that have been made through this trial and Detective Music listening to them that there are going to be things in the questioning of Marissa Travis that put her in a potential of being accused of a crime, such that she may feel the need to invoke her Fifth Amendment right.**

And I had mentioned that we should probably have an attorney on standby for her so that if that came to she could have time to speak with an attorney about legally what she can – what she's permitted to do, what her rights are. That type of thing because they're her rights as well. And [defense counsel] had indicated to me yesterday or the day before ---

[DEFENSE COUNSEL]: Right.

[PROSECUTOR]: -- that he had no intentions of asking her questions like that. But, again, every day's a new day when the evidence comes out, and how it comes out, and thoughts that come to you during the night.

[DEFENSE COUNSEL]: Right.

[PROSECUTOR]: I don't know if [defense counsel] has remotely changed his mind at all if we're going to get into those issues. Again, I would, I guess I would ask that we see if there's someone who is available to preserve Marissa Travis's rights seeing how she's here pursuant to a subpoena, under a court order, basically.

THE COURT: All right.

[Defense Counsel] what's your intention relating to the confrontation of your own witness relating to criminal aspects of her life?

[DEFENSE COUNSEL]: Your Honor, everything that [the prosecutor] just recited to the court is correct. We have discussed this.

I do not intend to ask Marissa if she did this. That doesn't mean I may not argue that it's possible, you know, in closing, but I don't intend to put her in that situation on -- * * * examination.

[PROSECUTOR]: And maybe not that question, but the implications.

[DEFENSE COUNSEL]: Well yeah, that's what I was going to say.

[PROSECUTOR]: You were alone with your child, you did this, and you were able to do this, but not that she did. That's not what I mean. But like you had opportunity to do this and you had opportunity to do that. And it may, again, I don't know what her understanding of the law is. What I don't want is to—for her to invoke her Fifth Amendment right, not having an attorney present, we're all stuck. [Defense Counsel] could then argue potentially in closing that, well, why would she invoke her Fifth Amendment right, you know, if she didn't have something to hide, which is fair game because she's not on trial, that's absolutely fair game for him to do, but it's very prejudicial to the jury and that's why I wanted a potential attorney here who could help her through those legal moves, because obviously the State can't nor can [defense counsel].

THE COURT: Well, my understanding was, when this conversation was over after we discussed it, at least I came away from the conversation with the impression that what [defense counsel] said then is what he said now to the affect that won't be raised.

[PROSECUTOR]: No.

[DEFENSE COUNSEL]: Yeah, I don't anticipate any of that.

THE COURT: At least that was my understanding.

[DEFENSE COUNSEL]: Yes.

[PROSECUTOR]: Well, he said he wouldn't ask her questions of that nature.

[DEFENSE COUNSEL]: Right.

[PROSECUTOR]: Now he's saying I won't ask her did you do this. But, again, did you do this doesn't—isn't the only way you can get incriminating statements from a person.

(Tr. at 885-890).

{¶27} Following this discussion, the trial court stated that to be on the "safe side" it would appoint counsel for Marissa. Defense counsel objected to the trial court's decision, arguing that the prosecutor was unreasonably assuming Marissa was going to invoke the Fifth Amendment right to remain silent before Marissa had a chance to properly consider it, and by appointing counsel Marissa might be pushed into invoking the Fifth Amendment right to remain silent. Defense counsel claimed that most criminal defense attorneys would likely recommend that Marissa invoke her Fifth Amendment right. Defense counsel then argued that unless Marissa requested legal counsel or invoked the Fifth Amendment they should not presume there was an issue and appoint counsel for her. In addition, defense counsel argued that he thought the State did not want Marissa to testify because the State knew she was going to say that Travis and Marissa "were coerced or that they felt as if the child was going to be taken from them if one of them didn't fess up to this." (Tr. at 901).

{¶28} The trial court overruled defense counsel's objection and maintained its ruling appointing counsel for Marissa, stating that during the trial defense had made some insinuations that Marissa could have been the one who hurt R.T., thus there was the potential for incrimination. Court then recessed for the day.

{¶29} During the night, Marissa spoke with her appointed counsel. When court reconvened the next day, the trial court spoke with the parties outside of the presence of the jury, and Marissa's appointed counsel made the following statement.

> **[MARISSA'S APPOINTED COUNSEL]: Yes, Your Honor. Thank you very much.**
>
> **Your Honor, as the Court is aware, yesterday I was here and there was an issue that was raised regarding the potential Fifth Amendment rights of my client, Marissa.**
>
> **It's my understanding that both the State and the defense \* \* \* have subpoenaed Marissa for purposes of the trial here today and as of today the State has rested. The defense is going to present their case in chief. And it's my understanding that the defense advised the court, as well as the prosecution \* \* \* they would be calling Marissa as a witness.**
>
> **At that time the Court \* \* \* asked me to consult with Marissa as to her constitutional rights, in particular her Fifth Amendment right against self[-]incrimination, and also the Court appointed me at that time.**
>
> **Marissa and I had the opportunity to meet yesterday and today. And after consultation and reflection she has advised me she does not wish to testify and wishes to invoke her Fifth Amendment right against self-incrimination under both the United States Constitution and Article 1, Section 10 of the Ohio Constitution.**
>
> **The reasons for the invocation of her Fifth Amendment right is number one, the State will not be providing any type of immunity. Number two, the defense cannot provide immunity. Number three, the potential exists to incriminate herself without the protection of immunity. And more importantly, there is a case that is currently pending in Allen County Juvenile Court with Children Services and reunification with her son. Any testimony or any information that can be obtained could affect her**

**reunification process with her son and that is very important to her.**

**Also, we believe that if the Court were allow her to testify after maybe general questions as to her name, address, and just basic information, we believe that will potentially create unfavorable and adverse inferences on the jury.**

**We're asking the Court to go ahead and allow her to invoke her Fifth Amendment privilege and doing so only after answering general questions, which I have advised her to do. After she gives her name and address we are going to then invoke the Fifth Amendment privilege.**

(Tr. at 906-908).

{¶30} Defense counsel again objected to the proceedings, arguing that Marissa was a witness the defense had anticipated calling throughout the trial, that her potential testimony had been referenced in defense counsel's opening statement, and that defense counsel formulated his trial strategy on the basis of being able to present her testimony. Further, defense counsel argued that a pending children's services case was not a valid reason to invoke the right to remain silent. In addition, defense counsel contended that he never intended to do anything to implicate Marissa in a crime through his questioning of her. Defense counsel concluded that he felt allowing Marissa to invoke the Fifth Amendment heavily prejudiced the defense.

{¶31} The trial court overruled the defense's objections stating that the evidence in the case indicated that two people had primary access to R.T., those

people being Travis and Marissa. The trial court reasoned that causes other than the application of force to R.T. had mostly been ruled out, and that the children's services case was significant. The trial court found that there were ultimately good grounds for the invocation of the Fifth Amendment by Marissa as expressed through her attorney, given that there was the potential to incriminate herself.

{¶32} Marissa Travis was then brought into the courtroom outside of the presence of the jury. She was sworn in, she stated her name, and she acknowledged being under subpoena when asked by the trial court. The trial court asked Marissa whether it was her intention to exercise her right to remain silent and not testify in this matter. Marissa said that it was her intention to invoke her right to remain silent. The trial court then allowed her to step down and the trial proceeded without Marissa's testimony.

{¶33} On appeal, Travis argues that it was error for the court to appoint an attorney for Marissa. Further, Travis argues that the trial court compounded its error by allowing Marissa to invoke the Fifth Amendment and refuse to testify where she did not have a reasonable basis to do so.

{¶34} At the outset of our analysis, we can find no error with the trial court's decision to act on the "safe side" and appoint counsel for Marissa in this matter. At this point in the trial, testimony had been presented that Travis had made a phone call to his mother stating that he thought Marissa had harmed R.T. Through cross-

examination Travis's counsel also extracted testimony that Marissa had a history as a marijuana user and a cocaine user. There were also suggestions of Marissa having post-partum issues. Given the limited access to R.T. as expressed by Marissa and Travis, there was the potential danger for incrimination.

{¶35} The Supreme Court of Ohio has held that a trial court has the duty to protect the constitutional rights of a witness as well as to ensure a defendant a fair trial. *State v. Schaub*, 46 Ohio St.2d 25, 27-28 (1976). As long as the trial court does not go so far as to encourage a witness's silence to the point of intimidation, advising a witness of her right to remain silent is well within a trial court's discretion. *See State v. Abdelhaq*, 8th Dist. Cuyahoga No. 74534, 1999WL1067924 *5.

{¶36} In this case the trial court had not even spoken to Marissa when it appointed counsel for her, thus there is no indication that the trial court could have intimidated her; rather, the record merely indicates that the trial court was attempting to safeguard Marissa's rights. Thus we can find no error with the trial court acting on the "safe side" and appointing her counsel.

{¶37} As to whether the trial court conducted a thorough enough inquiry of Marissa, and whether she had a reasonable basis for the invocation of the right to remain silent, Marissa's attorney spoke on her behalf, arguing that there was a danger of Marissa incriminating herself. The trial court found that the basis was

reasonable, and excused Marissa from testifying. A trial court has to "tread lightly" when questioning a witness regarding her reasoning for invoking the Fifth Amendment, and the trial court here largely permitted Marissa's counsel to articulate the reasons for the invocation. Under the circumstances of this case, where there seems a plausible basis for the invocation of the Fifth Amendment, we cannot find error here.

{¶38} Nevertheless, even if we did find error, we would also have to find that Travis suffered prejudice. We are primarily left to speculate as to what Marissa's testimony would have been, though defense counsel did proffer her testimony from the suppression hearing in this matter as what he suspected her testimony would be. During that suppression hearing, Marissa testified to feeling pressured by law enforcement in the interviews to admit to doing something to R.T., and that essentially Travis may have succumbed to the pressure.

{¶39} Even if we accepted that Marissa's testimony would have been the exact same on the date of trial as it was back at the suppression hearing, we cannot find that this evidence would have altered the outcome of the entire trial, given Travis's multiple confessions to the police and through the letter that he wrote. The interviews themselves, which were mostly recorded, seem to display a relatively congenial nature between the detectives and Travis. There is no indication that Travis's statements were anything but willing.

**{¶40}** Moreover, Travis testified on his own behalf that he felt pressured by the police to confess in the interviews, thus this issue was before the jury. Under these circumstances, we cannot find that even if the trial court erred in this matter, it was anything other than harmless. Therefore, Travis's first assignment of error is overruled.

*Second Assignment of Error*

**{¶41}** In his second assignment of error, Travis argues that the trial court erred by refusing to admit the transcript of Marissa's testimony at the suppression hearing into evidence once she had invoked her right to remain silent and was thus unavailable as a witness.

Standard of Review

**{¶42}** Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). *See also State v. Doe*, 101 Ohio St.3d 170, 2004-Ohio-705, ¶ 14 (applying this standard to the admissibility of attorney-client privilege claims). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

Analysis

**{¶43}** In this case, Travis claims that even if the trial court properly permitted Marissa to invoke her Fifth Amendment right to remain silent, the trial court erred by denying the defense's request to introduce a transcript of Marissa's prior testimony from the suppression hearing. Travis argues that once Marissa invoked the Fifth Amendment, she was unavailable as a witness. He contends that she testified at a prior hearing and was subject to cross-examination, rendering her testimony admissible under Evid.R. 804(B)(1), which reads as follows.

> **(B) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:**
>
> **(1)** *Former Testimony.* **Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. \* \* \***

**{¶44}** When the defense attempted to admit the transcript of Marissa's prior testimony from the suppression hearing in this case, the State acknowledged that testimony from the suppression hearing would qualify as former testimony in this proceeding and that the State had the opportunity to cross-examine Marissa at that time. However, the State argued that it did not have a "similar motive to develop the testimony" as required under Evid.R. 804(B)(1). The State contended that its cross-examination at the suppression hearing was conducted in the very limited

scope of whether Travis was in custody when he was interviewed and whether there was any police misconduct or coercion by the police. The trial court found the State's argument persuasive, and denied defense counsel's request to introduce the transcript of Marissa's suppression testimony into evidence.

**{¶45}** In our own review of the matter, we note that courts have found that "An identical motive to develop testimony is not required by Evid.R. 804(B)(1), only a similar motive." *State v. Mitchell*, 2d Dist. Montgomery No. 24797, 2012-Ohio-3722, ¶ 20 quoting *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 26. As the motive only needs to be similar, the State's argument that it did not have the same motive is not outcome determinative here. This appears particularly true in this case, given that defense counsel's expressed desire for Marissa's testimony was to have her testify regarding the events specifically related to the suppression hearing. Because of this, we do find that the trial court erred by refusing to admit the prior transcript testimony in this matter.

**{¶46}** Nevertheless, we can find no material prejudice in this matter. In this case there was extensive medical testimony combined with testimony from the officers and the various statements made by Travis prior to the trial. In addition, Travis testified himself, so that the jury could hear and evaluate his credibility as to whether he felt pressured in the interviews. The jury was also able to listen to the tone and tenor of the interviews that were recorded in order to determine if Travis

seemed to be telling the truth regarding being pressured.  On this basis, we cannot find that the error here was prejudicial.  Therefore Travis's second assignment of error is overruled.

## *Conclusion*

**{¶47}** For the foregoing reasons Travis's assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**